**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**JEWEL ROSE HYDE, PATRICIA Y. GRAY, and KAREN BOOTHE,
Defendants**

Crim. No. 1993-65

District Court of the Virgin Islands

Div. of St. Thomas and St. John

October 21, 1993

## MEMORANDUM AND ORDER

### I. INTRODUCTION

This matter is before the Court on the suppression motions of defendants Jewel Rose Hyde ("Hyde"), Patricia Gray ("Gray") and Karen Boothe ("Boothe"). Defendants have moved to suppress the "fruits" of the searches conducted by Senior Customs Inspector Gloria A. Lambert ("Lambert") on March 25, 1993. The basis for the motions[1] is that the searches were not justified by the "border

---

[1] For purposes of simplicity, this Court will refer to the defendants' arguments collectively, although each of the defendants is represented by separate counsel who filed separate motions to suppress. Defendant Boothe's motion was

107

search" exception to the Fourth Amendment.[2] The government contends that the border search exception is applicable, and therefore neither probable cause nor reasonable suspicion was required.

This Court held a hearing on these issues on July 12, 1993, the government filed its opposition to the defendants' motions on July 16, 1993, and upon request of this Court, counsel for each of the parties has filed supplemental briefs. This Court, having heard the evidence and reviewed the motions and the pertinent case law, will grant defendants' motions because the searches did not fall under the border search exception nor were they based on probable cause or reasonable suspicion.

## II. THE FACTUAL AND LEGAL BASES FOR THE SEARCH

The facts developed at the hearing are that these three defendants were returning to Miami, Florida from St. Thomas. The defendants were required to pass through the customs preclearance area of the St. Thomas airport. All domestic and international passengers must complete customs declaration forms and present themselves and their checked and carry-on luggage for inspection by customs officials who may question and search them. Defendant Hyde, who appeared to be traveling alone, was initially questioned by Inspector Lambert. Among other things, Lambert learned that Hyde had stayed in St. Thomas for only two days, that the purpose of her trip was to purchase merchandise, that Hyde had not declared any merchandise on her customs form nor did her luggage contain any new purchases, and that Hyde appeared hostile and agitated.[3] At the same time, Lambert overheard a conversation between another customs official behind her and a female passenger

---

filed first; subsequently, defendants Gray and Hyde each filed motions to suppress and joined the arguments made by defendant Booth.

[2] Defendants have also objected to the searches on the grounds that: (1) even if the border search doctrine applies, the searches were non-routine and therefore required reasonable suspicion; and (2) a race-based profile was used to single them out. In light of the findings announced below, this Court does not need to determine what factual predicate is required for non-routine border searches. In addition, the Court finds no evidence to support the conclusion that defendants were searched because they were single, black females.

[3] At one point, Inspector Lambert mentioned that she noticed a bulge beneath defendant Hyde's clothing. However, the Court does not credit this statement because it was made only as an afterthought toward the end of Lambert's testimony.

who also stated that she had visited St. Thomas for only two days. The Inspector then instructed Hyde to wait while she questioned this other passenger and a companion who was standing beside her. Inspector Lambert was informed by one of these passengers, defendant Boothe, that she had been called back to the continental United States by her employer. Lambert also noticed that Boothe's companion, defendant Gray, appeared to be very nervous. Inspector Lambert testified that she did not discover anything out of the ordinary when she searched both ladies' luggage, but she nevertheless ordered all three women to proceed to the secondary search area where she performed a pat down of each of them. Upon discovering a bulge under the clothing of each of the defendants, Lambert conducted a further search, and she discovered packages containing cocaine taped to each defendant's body.

■ It is well-recognized that law enforcement officials may stop and briefly detain individuals for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity "may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). Although the level of suspicion required for an investigatory stop is less demanding than probable cause, reasonable suspicion is not a toothless standard. To the contrary, the officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" Id. at 27.

■ The factors on which Inspector Lambert testified that she based her stop of these defendants and pat-down or "frisk" of their persons, taken as a totality, do not rise to the level of probable cause or even reasonable suspicion.[4] Indeed, Lambert herself articulated that she acted as much on a "gut feeling" that something was amiss as on any or all of the factors she recited. The Supreme Court has consistently required much more in order to conduct an investigatory stop. See, e.g., United States v. Sokolow, 490 U.S. 1 (1989). Although "wholly lawful conduct [may] justify the suspicion that criminal activity [is] afoot," Reid v. Georgia, 448 U.S. 438,

---

[4] The Court has considered the factors articulated by Lambert as they relate to each defendant individually and concludes that the factors do not rise to the level of creating reasonable suspicion that any one of them was involved in criminal activity. The Court also concludes that, even if the defendants are considered collectively, Inspector Lambert lacked reasonable suspicion when she detained them.

441 (1980) (per curiam), "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts," Illinois v. Gates, 462 U.S. 213, 243–44 n.13 (1983). In this case, there is no basis for concluding that Inspector Lambert's decision to pat down these defendants was based upon anything more than a "hunch."

Because inspector Lambert lacked reasonable suspicion to detain Hyde, Gray, and Boothe, the stop and search of these defendants can only be upheld if the Court finds that the border search exception applies in this case. The issue in this case is thus whether a United States citizen, or other person lawfully living in or visiting the United States Virgin Islands, can be subject to search and seizure without probable cause or reasonable suspicion when traveling by direct commercial airline flight to Miami or elsewhere in the continental United States. The issue presented does not involve the prerequisites for searching and seizing persons as they arrive in the Virgin Islands from outside the geographic areas and boundaries of the United States or as they leave the Virgin Islands for such foreign places.

## III. THE FOURTH AMENDMENT'S PROHIBITION OF UNREASONABLE SEARCHES APPLIES TO THE UNITED STATES VIRGIN ISLANDS

Because the defendants have alleged that the searches violated the Fourth Amendment, this Court must first determine whether and to what extent the Fourth Amendment applies in the Virgin Islands. It is beyond peradventure that Congress has the authority to decide which provisions of the Constitution apply to unincorporated territories of the United States such as the Virgin Islands. See U.S. CONST. art. IV, § 3, cl. 2; Government of the Virgin Islands v. Bodle, 427 F.2d 532, 533 n.1 (3d Cir. 1970). In some instances, Congress has chosen not to afford United States citizens residing in the Virgin Islands the same rights as other citizens. For example, residents of the Virgin Islands who are also United States citizens cannot vote for the President of the United States nor are they entitled to elect a representative to the House of Representatives or to the Senate; instead, they elect a nonvoting Delegate to Congress. More significantly for our criminal justice system, the Fifth Amendment's stricture that no person shall be charged with a felony "unless on a presentment or indictment of a Grand Jury" does not

apply in the Territory, although a grand jury has been available since 1984 for federal crimes.[5]

In exercising its "Power to . . . make all needful Rules and Regulations respecting the Territory . . . belonging to the United States,"[6] Congress has set up the structure for governance of the Virgin Islands in a document called the "Organic Act," which is the equivalent of our constitution. Although the Organic Act of 1936 did not make the Fourth Amendment directly applicable to the Territory, it stated in section 34 that "the right to be secure against unreasonable searches and seizures shall not be violated. No warrant for arrest or search shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." In 1954, the Organic Act was revised and the language of section 34 was adopted verbatim as section 3. See Virgo Corporation v. Paiewonsky, 384 F.2d 569 (3d Cir. 1967), cert. denied, 390 U.S. 1041 (1968).[7]

■ In 1968, section 3 of the Revised Organic Act of 1954 was amended in relevant part to state:

> The following provisions of and amendments to the Constitution of the United States are hereby extended to the Virgin Islands to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: . . . the first to ninth amendments inclusive . . . .

> All laws enacted by Congress with respect to the Virgin Islands and all laws enacted by the territorial legislature of the Virgin Islands which are inconsistent with the provisions of this subsection are repealed to the extent of such inconsistency.

Pub. L. 90–496, § 11, 82 Stat. 837, 976 (1968) (codified at 48 U.S.C. § 1561 (1988)).[8] Whether or not the Fourth Amendment was fully

---

[5] See Revised Organic Act of 1954 §§ 3, 24(b) (codified at 48 U.S.C. §§ 1561, 1614(b) (1988)).

[6] U.S. CONST. art. IV, § 3, cl. 2.

[7] Section 34 was repealed on Oct. 19, 1982. See Pub. L. 97–357, § 307, 96 Stat. 1709 (1982).

[8] The Fifth Amendment right to prosecution by grand jury indictment is expressly excepted from this provision: "Provided, That all offenses against the laws of

applicable before 1968, since then it has had the same force and effect in Virgin Islands as it has in any state of the United States. See Government in re Evan S., 16 V.I. 180, 182 (Terr. Ct. 1979).

Since the Fourth Amendment's prohibition against unreasonable searches and seizures fully applies to the United States Virgin Islands, this Court now considers whether the geographic and legal relationship between the Virgin Islands and the United States is such that United States citizens, and others legally in the Virgin Islands, who are traveling from this Territory to any of the fifty states or Puerto Rico are lawfully subject to border searches, that is, searches and seizures not based on probable cause or reasonable suspicion.

## IV. THE BORDER SEARCH DOCTRINE

A. *History of Border Search Doctrine*

■ The principle that the federal government "has plenary power to conduct routine searches and seizures at the border" is as old as the Fourth Amendment's prohibition against unreasonable searches and seizures. United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). Indeed, because the Congress that drafted the Fourth Amendment also enacted the first legislation permitting searches at the border,[9] some courts have reasoned that border searches are more aptly characterized as inherently reasonable rather than as exceptions to the strictures of the Fourth Amendment. See, e.g., United States v. Martell, 654 F.2d 1356, 1360 (9th Cir. 1981), cert. denied, 463 U.S. 1213 (1983).

Because of the need of the sovereign to protect herself, persons wishing to come into the United States from foreign countries are subject to fundamentally different treatment than individuals who are simply traveling within the nation's borders:

> Travelers may be . . . stopped in crossing an international boundary, because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in and his belongings as effects which may be lawfully brought in. But those lawfully within the country . . have a

---

the United States and the laws of the Virgin Islands which are prosecuted in the district court . . . *may* be had by indictment by grand jury *or by information* . . . ." (emphasis added).

[9] See Boyd v. United States, 116 U.S. 616, 623 (1886).

right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that . . . [the individual is] carrying contraband or illegal merchandise.

Carroll v. United States, 267 U.S. 132, 153–54 (1925); see also United States v. Ramsey, 431 U.S. 606, 618–19 (1977).

B. *Application of the Border Search Doctrine*

The mere fact that St. Thomas is not contiguous to the continental United States does not cause there to be a "border" or an "intermediate border" between the Virgin Islands and the continental United States. See Torres v. Puerto Rico, 442 U.S. 465 (1979). In Torres, the Commonwealth of Puerto Rico maintained that it should have the authority to search travelers arriving from the continental United States without probable cause or reasonable suspicion because it constituted an "intermediate border" within the United States due to "its unique political status"[10] and because "its borders . . . are in fact international borders with respect to all countries except the United States." Id. at 472. The Supreme Court rejected the Commonwealth's argument, emphasizing that "Puerto Rico is not unique because it is an island; like Puerto Rico, neither Alaska nor Hawaii are contiguous to the continental body of the United States. Moreover, the majority of all the states have borders which coincide with the international frontier of the United States . . . ." Id. at 474[11]

---

[10] This Court has not found any case law to support the legal concept of a border, intermediate or otherwise, between the Virgin Islands and the continental United States merely because of the Islands' political status as a territory of the United States. To the contrary, the Ninth Circuit has suggested that there is no such border for United States territories. See Barusch v. Calvo, 685 F.2d 1199 (9th Cir. 1982). Barusch challenged a search conducted in Guam without probable cause upon his arrival from the Northern Marianas Islands. At the time, the Northern Marianas had not yet achieved "a political status comparable to other United States territories," and its citizens had not yet become citizens of the United States. Id. at 1202. The obvious implication of the Ninth Circuit's opinion—which is fully consistent with the Supreme Court's holding in Torres—is that a border search would not have been permitted if Barusch had been traveling from a territory of the United States to Guam.

[11] Accordingly, luggage bound to Miami from Puerto Rico cannot be searched pursuant to the border search exception, even though customs officials in Puerto Rico can search luggage bound for international destinations. See United

Torres also teaches that just as the existence of a border hinges on notions of sovereignty[12] and not upon traditional concepts of geography, searches without probable cause under the border search doctrine cannot be justified because of the urgency of law enforcement needs. The Court refused to accept Puerto Rico's contention "that its law enforcement problems are so pressing that it should be granted an exemption from the usual requirements of the Fourth Amendment." Id. at 473. In this regard, Torres echoes earlier Supreme Court exhortations against creating exceptions to the Fourth Amendment to address the myriad challenges confronting law enforcement officials today. See, e.g., Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973).

## V. CUSTOMS SEARCHES

■■ Since the United States is sovereign over the U.S. Virgin Islands, it would seem obvious that there is no basis for a border search of individuals traveling directly to the mainland from the Territory. The government nevertheless contends that such a search is proper since the Virgin Islands constitutes a "separate customs zone" from the "United States customs territory" and customs officials therefore have greater authority to search travelers. The government relies on an earlier decision of this Court, United States v. Chabot, 531 F. Supp. 1063 (D.V.I. 1982), and 19 U.S.C.A. § 1467 (West 1980). Before considering these points, this Court notes that border searches—inspections, searches and seizures to protect the sovereign at her borders—are usually conducted by customs officials. See, e.g., United States v. Beck, 483 F.2d 203, 207 (3d Cir. 1973),

---

States v. Maldonado-Espinosa, 767 F. Supp. 1176, 1181–84 (D.P.R. 1991), aff'd, 968 F.2d 101 (1st Cir. 1992).

[12] If the defendants here had been traveling directly from a foreign country to the United States through St. Thomas, without leaving the airline terminal, case law would authorize a border search at the St. Thomas airport. In fact, the defendants in this case apparently had traveled to St. Thomas from the island of St. Kitts about two days before the March 25, 1993 searches. There has been no suggestion that these defendants were not subject to a legitimate border search at that time.

It is also worth noting that the defendants were about to embark on a direct flight from St. Thomas to Miami. Therefore, this Court need not determine whether persons who traverse foreign land or waters during travel by air or sea would be properly subject to a border search upon leaving the Virgin Islands or arriving in Miami.

cert. denied, 414 U.S. 1132 (1974); United States v. Glaziou, 402 F.2d 8, 12 (3d Cir. 1968), cert. denied, 393 U.S. 1121 (1969).

Thus, there is seldom any need to analyze separately the requirements and scope of a search performed by customs officials at some location that is not also a border. Having located no authority to the contrary, this Court finds that activities performed by customs officials not stationed at an international border or its functional equivalent must comply with the Fourth Amendment.

A. *The Virgin Islands as a "Separate Customs Zone"*

In Chabot, this Court was presented with a suppression motion filed by the pilot of a small airplane that flew from San Juan, Puerto Rico to St. Croix, Virgin Islands, where approximately 766 pounds of marijuana was discovered in it. The defendant moved to suppress the drugs and argued that neither the customs inspector nor the police officer who first arrived on the scene had probable cause to search the airplane. The Court denied Chabot's motion, finding that there was probable cause to conduct a search because the aircraft landed while the airport was closed, the pilot had not filed a flight plan or obtained clearance to land, the airplane landed at the cargo area designated for commercial aircraft even though it was privately owned, and bundles of packages inside were clearly visible from the runway. Since the defendant had also argued that he had not crossed a border in flying directly from Puerto Rico to St. Croix, and was therefore not subject to a border search, the Court apparently felt compelled to deal with this issue. In what is clearly dicta, the Court reasoned that because the United States Virgin Islands is a separate "customs zone,"[13] St. Croix constituted a "border" which would have justified the search of the airplane by the customs official even without probable cause or reasonable suspicion.

■ This Court cannot find any support for Chabot's conclusion that the statutes governing the collection of customs duties in the Virgin Islands have the effect of rendering St. Thomas foreign for Fourth Amendment purposes. There is no quarrel with Chabot's

---

[13] To support its conclusion that St. Croix constituted a separate "customs zone," the Chabot court cited 19 U.S.C. § 1401(h) (1988). Section 1401 is the definitional portion of the Tariff Act of 1930. It provides in relevant part: "The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands."

observation that the unique customs position of the Virgin Islands is largely due to the historical fact that, when the Virgin Islands were purchased by the United States, Danish "laws were already in place which provided for Customs duties to be levied upon goods coming into the Virgin Islands, with the revenue going to the colonial treasury." 531 F. Supp. at 1069 (citing Danish Colonial Law of Apr. 6, 1906 § 56, reprinted in V.I. CODE ANN. tit. 1 (1967)). The federal government merely "continued the customs laws and regulations in force prior to the transfer of ownership of the Virgin Islands," with the effect that monies collected are returned to the Virgin Islands treasury. Id. (citing Act of Mar. 3, 1917, ch. 171, 39 Stat. 1132, reprinted in V.I. CODE ANN. tit. 1 (1967)). Unable to find any legislative or decisional support for the proposition that these customs laws effectively abrogate the Fourth Amendment's prohibition against warrantless searches and seizures without probable cause,[14] this Court rejects the dicta to the contrary in Chabot.

B. *Application of 19 U.S.C.A. § 1467 to the United States Virgin Islands*

■ The government also has cited 19 U.S.C.A. § 1467 (West 1980) as support for the search of these defendants by Inspector Lambert. Section 1467 states as follows:

Whenever a vessel from a foreign port or place . . . arrives at a port or place in the United States . . ., whether directly or via another port or place in the United States or the Virgin Islands, the appropriate customs officer for such port or place of arrival may, under such regulations as the Secretary of the Treasury may prescribe and for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged or unladen from such vessel, whether or not any or all such persons, baggage or merchandise has previously been inspected, examined, or searched by officers of the customs.[15]

This section could provide support for the search of these defendants only if it is an exercise of Congress' constitutional authority to abrogate the scope of the Fourth Amendment's application to the

---

[14] See supra part III.

[15] Section 1467 also applies to civil air travel. See 19 U.S.C.A. § 1644(a) (West 1980).

Virgin Islands. The legislative history of section 1467 is sparse and provides virtually no direction in this inquiry.[16] It was enacted in 1938 as a part of the Tariff Act of 1930 and has not been significantly amended.[17] As discussed above, Congress has since made the Fourth Amendment applicable to the Virgin Islands without expressly limiting its scope.[18] Congress easily could have written an exception to the prohibition against unreasonable searches and seizures, just as it did with the Fifth Amendment's requirement of prosecution by grand jury indictment. Since Congress did not do so, section 1467 cannot authorize the warrantless search of these defendants without probable cause.[19]

## VI. CONCLUSION

■ Neither the present version of the Organic Act, nor 19 U.S.C.A. § 1467 (West 1980), indicate any intention to limit the application of the Fourth Amendment to the United States Virgin Islands. Because this Court finds that the border search exception to the Fourth Amendment is not applicable in this case, and because Inspector Lambert did not have reasonable suspicion, much less probable cause, to suspect that the defendants were engaged in criminal activity, the evidence seized from them must be suppressed. See Wong Sun v. United States, 371 U.S. 471, 484–85 (1963).

Accordingly, it is hereby ORDERED that defendants' motions to suppress are GRANTED.

---

[16] The Court notes that it has received very little research assistance from the United States Government and its affected agencies to support the procedures currently employed at the St. Thomas airport.

[17] See Pub. L. No. 91-271, § 301, 84 Stat. 274 (1970).

[18] See supra part III. In construing section 1467, this Court is guided by the well-established principle that statues should be construed so that they are constitutional. See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988).

[19] Whatever inspections, examinations and searches may properly be done under section 1467, the Court notes, but does not determine, that existing rules and regulations do not appear to authorize the routine preclearance inspections currently conducted at the St. Thomas airport.