**UNITED STATES OF AMERICA, Plaintiff**

v.

**JOHN R. CHABOT, Defendant**

Criminal No. 81-126

**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

v.

**JOHN R. CHABOT, Defendant**

Criminal No. 82-02

District Court of the Virgin Islands

Div. of St. Croix

February 5, 1982

29

ERIC B. MARCY, Special Assistant United States Attorney, Christiansted, St. Croix, V.I., *for Government*

JEFFREY L. RESNICK, ESQ., Christiansted, St. Croix, V.I., *for defendant*

MICHAEL D. GELETY, ESQ., Fort Lauderdale, Florida, U.S.A., *for defendant*

O'BRIEN, *Judge*

## MEMORANDUM OPINION

This decision is the outgrowth of a motion to suppress evidence seized in a warrantless search of an aircraft in the early morning hours of December 23, 1981, at Alexander Hamilton International Airport, St. Croix. As the result of the search, nearly 800 pounds of marijuana were seized, and the defendant faces multiple charges, both federal and territorial, involving importation and possession of a controlled substance. When defendant moved to suppress the evidence, the government, at the hearing on January 22, 1982, accepted the burden of proof to show that the actions of the police and the United States Customs officials met the requirements of law.

The Court holds, in this decision, that the United States Attorney has met the burden of proof, and the motion will be denied for the reasons stated herein.

Jury selection will commence February 8, 1982.

*The Facts*

Shortly after midnight on the night of December 22–23, 1981, the

police received a call from the proprietor of The Inn, a restaurant-motel located at Alexander Hamilton Airport, that what appeared to be a burglary was taking place at the American Airlines hangar. With no other information than that, Officers Wilson and James, in one patrol car, sped to the airport. The airport operations had shut down for the night. They obtained entry by having a Port Authority firefighter open the closed gate. En route, they had observed a white van with a black stripe in the vicinity leaving the area.

Within a short time, the patrol car entered the eastern end of the single runway of the airport, and proceeded west. At the same time, to their astonishment, an airplane had landed at the airport and was proceeding from west to east on the same runway. The evidence is uncontradicted that the patrol car and the airplane passed one another at a point about 250 feet from the eastern end of the runway.

The evidence is also not in dispute that the airplane did not have any lights on, either "landing" lights or "running" lights. The patrol car was also unlit, its headlights or spotlights then not being utilized. After passing on the runway, the airplane taxied not to the passenger unloading area, or to the private aircraft parking area, but to the American Airlines cargo area. It was not an American Airlines plane.

The patrol car followed, and the officers watched the airplane come to a stop near the cargo area under a bright security light. Then, the spotlight of the patrol car was turned on, and the pilot disembarked from the plane and began walking towards the car. At the same time, the two officers split up, and Officer James, gun drawn, began circling around the individual, who, upon noticing Officer Wilson, remarked "Oh, a police woman". Officer Wilson, who was indeed a policewoman, obtained his pilot's license from the pilot, and also began taking down information as to the serial number of the plane. In the course of this effort, she could see clearly inside the plane, and observed bundles wrapped in plastic and taped. From her training at the "academy", she remembered that this was often the manner in which marijuana was packed.

Meanwhile, Officer James, a nine-year veteran of police service, who was in charge of the two-person patrol, asked several questions of the pilot. The pilot told him he had flown in from San Juan, Puerto Rico, for a "date", that the items bundled in the rear of his plane were "personal baggage", that he intended to return to San Juan in the morning, that he did indeed have permission to land, and "no", Officer James could not go into the plane. There was no

31

indication that this was an emergency landing. (He had previously told Officer Wilson that he *did not* have permission to land.)

Officer James then jumped on the wing, opened the aircraft door (already three inches open), peered in, and observed the same thing Officer Wilson had noted from outside the plane . . . packages wrapped in plastic and taped. He also noted the strong smell of marijuana. He arranged for Firefighter Gittens, who had been observing all the activity, to notify the on-call U.S. Customs Inspector, he, Officer James, being unclear of the jurisdictional aspects of a plane landing at night without lights at the airport when it was closed down. He was also joined by other curious officers, and a police dog who, in one form or another, encircled the aircraft, although it is in dispute whether the craft was blocked from any possible departure.

Customs Inspector Nielsen, a six-year veteran of the U.S. Customs Service, appeared on the scene at 12:50 a.m. on the morning of December 23, 1981, about thirty minutes after being summoned. He was in uniform. He then determined in questioning of the pilot that, contrary to what the pilot had told Mr. James, he had not sought permission to land, had not filed any flight plan, and had not made any customs clearance arrangements with San Juan or anyone else for a midnight landing at St. Croix. The pilot had also failed to file either the general declaration for private aircraft, or the air cargo manifest, which the Inspector maintained in testimony was required for anyone entering St. Croix from San Juan, from whence the pilot indicated he had flown. The Inspector also stated that this was, to his memory, the first time in at least six months that an unannounced aircraft had landed after the airport was shut down. It was the common practice to notify officials in advance if there was to be a late landing, he added.

He could also see from his position on the ground, large bales inside the plane, easily observable. From his experience, he noted that the plane, being a six-passenger craft, was lacking two of the six seats, and the bales were stacked in the area which would have accommodated the final two seats, as well as on the other seats still in the plane. He had a firm suspicion that he was dealing with contraband.

He asked permission to have one bale brought from the plane for further close inspection. He stated at the hearing that the pilot agreed. The pilot took the stand briefly to state that he gave permission for the removal, because he thought he had no other choice. Nonetheless, all parties agreed that the pilot did in fact remove one

package, and put it on the ground. The inspector cut it open, and observed weed-like material inside. He took it to his office, tested it, and it came out "positive" for marijuana. At 2:05 a.m., John R. Chabot, the pilot, and now the defendant, was placed under arrest under federal charges. Twenty packages and one duffelbag were seized. Approximately 766 pounds of marijuana were packed inside the packages as cargo. Violations of the Virgin Islands Code have now been added and the matter has been consolidated.

## The Defense Contentions

The defense ably argued that the actions by Officer James in further opening the plane's door, peering in, and taking note of the contents and their smell, were an unconstitutional search, in contravention of the Fourth Amendment, in that the Officer had no probable cause for such a warrantless search.

The defense also argued that the Customs Inspector had no probable cause for his own actions, refused to concede that this was a "border search", since the plane was in transit from San Juan to another location under the United States flag, and it too was an unconstitutional deprivation of Mr. Chabot's Fourth Amendment rights. We take each of these contentions in order.

## I. Police Officer's Search

■■ The Fourth Amendment of the U.S. Constitution prohibits unreasonable searches and seizures, Wolf v. Colorado, 338 U.S. 25 (1949), and the exclusionary rule requires that evidence obtained in violation of the prohibition not be used as evidence against a defendant. Mapp v. Ohio, 367 U.S. 643 (1961). Central to the Fourth Amendment prohibition against unreasonable searches and seizures is the requirement of a search warrant. Searches made without a search warrant are unconstitutional unless they fit into one of certain recognized exceptions to the warrant requirement.[1] Michigan v. Tyler, 436 U.S. 499, 506 (1978).

At the suppression hearing on January 22, 1982, counsel for both parties stipulated that the police officers involved did not have a search warrant. Thus, in order for the actions taken by the police to be constitutionally permissible and the results of the search admitted

---

[1] A warrant is generally not necessary in the following situations: 1. A search incident to a lawful arrest; 2. A search involving a vehicle; 3. Where items are in plain view; 4. When consent has been given to a search; 5. During a stop and frisk arrest; and 6. When a police officer is in hot pursuit of a felon or when the evidence is evanescent.

into evidence, the search must fall within one of the aforementioned exceptions. This Court finds that the brief stop and detention of the plane by Officers Wilson and James was based on reasonable suspicion and therefore valid, and that this suspicion duly ripened into probable cause, therefore justifying the "search" of the plane by Officer James without a warrant.

At oral argument, counsel for defendant argued that the police officers did not have the reasonable suspicion necessary to detain defendant, prior to calling in the Customs Officials.

Second, the defense claimed that even if such stop and detention were constitutionally permissible, the police erred in not simply holding the plane until a search warrant was obtained.

Third, counsel asserted that the police did not have probable cause to step on board defendant's plane and peer inside, activity which allegedly amounted to a search.

■ We first address defendant's argument that Officer James did not have reasonable grounds to justify the initial detention of defendant and his plane, prior to the arrival of the U.S. Customs Inspector. It is well settled that a brief stop of a suspicious individual is permitted to maintain the status quo while obtaining more information, where criminal activity is suspected. Adams v. Williams, 407 U.S. 143, 146 (1972). The federal standard, as set forth in Wilson v. Porter, 361 F.2d 412, 415 (9th Cir. 1966), requires only a "founded suspicion . . . some basis from which the court can determine that the detention was not arbitrary or harassing."

■ Defendant's claim that his detention was not grounded on reasonable suspicion must be rejected out of hand. To determine reasonable suspicion, the totality of particular circumstances must be considered and the facts assessed, not in a vacuum, but in light of the officer's professional experience. United States v. Kreimes, 649 F.2d 1185, 1189–90 (5th Cir. 1981).

■ Reasonable suspicion to support the instant stop and detention is certainly found in the notice of an alleged burglary, defendant's failure to report his landing at the Alexander Hamilton Airport for customs processing, his late hour arrival and taxiing to the American Airlines cargo hangar although his plane was a small private passenger aircraft, and the fact that his mysterious date never appeared at the airport to pick him up, though he was without ground transportation. See United States v. Moore, 638 F.2d 1171, 1174 (9th Cir. 1980), cert. denied, 449 U.S. 1113 (1981). Defendant's plane was evidently detained with a reasonable suspicion by the

34

officers that an activity out of the ordinary was taking place, that defendant was connected with the unusual activity and that the activity was related to crime, specifically narcotics smuggling. United States v. Lovenguth, 514 F.2d 96, 98 (9th Cir. 1975). For the officers to think otherwise would fly in the face of common sense and their professional training and experience.

■ The police officers promptly informed defendant that he was being stopped,[2] and that a Customs Inspector was being called in to handle the matter. This type of investigatory detention has been recognized as reasonable under the Fourth Amendment, pending the arrival of specialized officers who are more familiar with the laws which are the subject of possible violation. United States v. O'Looney, 544 F.2d 385, 389 (9th Cir.), cert. denied, 429 U.S. 1023 (1976). For if defendant could not be stopped and detained pending the arrival of, and examination by customs officers, then customs laws would be unenforceable. United States v. Moore, 638 F.2d 1171, 1174 (9th Cir. 1980), cert. denied, 449 U.S. 1113 (1981).

The Fourth Amendment, which is the basis of defendant's motion, did not require the police officers simply to shrug their shoulders and allow a crime to occur or a criminal to walk (or fly) away. The evidence amply supports a finding that the temporary detention of the plane was justified by the officers' rational and founded suspicion that the plane had been involved in the commission of a crime.

At oral argument, defense attorneys maintained that, assuming arguendo, the plane was lawfully detained, the plane nevertheless should not have been searched, but should have been held by police until a search warrant was issued.[3] In Chambers v. Maroney, 399 U.S. 42, 52 (1970), upon which this Court relies, the Supreme Court of the United States expressly rejected defendant's argument.

---

[2] Stops have been routinely permitted to deter the flow of contraband into the country, particularly narcotics. United States v. Lovenguth, 514 F.2d 96 (9th Cir. 1975). Factors which have been considered in assessing the validity of a brief detention, all of them present here, include the late hour of night in which the activity took place, the driving to and from a border area and the agent's personal knowledge that narcotics smuggling was likely to occur under cover of darkness. United States v. Nunez-Villalobos, 500 F.2d 1023, 1024 (9th Cir.) cert. denied, 419 U.S. 1090 (1974).

[3] This proposition cannot be supported by Coolidge v. New Hampshire, 403 U.S. 443 (1971), cited in Defendant's Memorandum of Law in Support of Motion to Suppress at 2, for, in Coolidge, the police had ample opportunity to secure a warrant, knew the car's description and location in advance and intended to seize it; furthermore, no contraband was involved.

35

■ The Court held, that for constitutional purposes, there was no difference between seizing and holding a car before presenting the probable cause issue to a magistrate and the carrying out of an immediate warrantless search. It was the learned opinion of the Court that "[g]iven probable cause to search, either course is reasonable under the Fourth Amendment."

As a third argument, defendant's counsel posited that Officer James, in effect, tainted any evidence subsequently uncovered by the customs agent when he stepped onto the airplane's wing and stuck his head inside a partially open door. While Officer James may not have had probable cause to search defendant's plane when it first landed, his reasonable suspicions ripened into probable cause, sufficient to support warrantless search, after listening to defendant's explanation for his unscheduled flight into the airport, his plane's location at a cargo hangar (contradicted by defendant's description of his cargo and refusal to unload it) and Officer Wilson's view of such cargo from the outside of the plane. See United States v. Edwards, 577 F.2d 883, 895 (5th Cir.), cert. denied, 439 U.S. 968 (1978).

■ To permit a warrantless search based on probable cause, the officer conducting the search must have reasonable and probable cause to believe that he will find the instrumentality of a crime or evidence pertaining to a crime. Dyke v. Taylor Implement Manufacturing Co., 391 U.S. 216, 221 (1968). There can be no question that Officer James, confronted with a small airplane unexpectedly arriving at the American Airlines hangar in the middle of the night filled with suspicious looking cargo, found the circumstances highly unusual and, knowing that drugs are often transported at night in small aircrafts, had difficulty in "imagining an innocent explanation for the activity." United States v. Wabnik, 444 F.2d 203, 205 (2d Cir.), cert. denied, 404 U.S. 851 (1971).

■ For the foregoing reasons, we hold that Officer James was fully justified in believing that a crime was occurring before him and had probable cause for the actions taken by him, thus vitiating the need for a search warrant.

## II. *The Customs Search*

With respect to the customs search, the defendant has contended that the U.S. Customs Inspector had no right, and no reason, to search the airplane because the journey originated in San Juan, Puerto Rico, and ended in St. Croix, U.S. Virgin Islands. Such a flight, defendant argued, is entirely within the boundaries of the

United States, and this does not involve U.S. Customs. Defendant further argued that since the Territory of the Virgin Islands is not a customs zone separate from the United States, Puerto Rico and other U.S. possessions, then the search conducted by the Customs Inspector could not constitute a "border search",[4] and a search warrant was therefore required.

 This Court finds that the Territory of the U.S. Virgin Islands is a "customs zone" separate and apart from the United States, Puerto Rico and other U.S. possessions, as evidenced by the statutes governing the collection of customs duties and the enforcement of immigration laws in the Virgin Islands. Consequently, the island of St. Croix constitutes a "border" or its functional equivalent within the meaning of the "border search" exception to the warrant requirement. Thus, the search of defendant's plane by the Customs Inspector was a valid border search, for which no search warrant was necessary.

When the United States purchased the Virgin Islands from Denmark in 1917, laws were already in place which provided for customs duties to be levied upon goods coming into the Virgin Islands, with the revenue going to the colonial treasury. See 1 V.I.C., Danish Colonial Law of April 6, 1906, § 56. The Act of Congress, which implemented the treaty of purchase between Denmark and the United States, continued the customs laws and regulations in force prior to the transfer of ownership of the Virgin Islands. 1 V.I.C., Act of Congress, March 3, 1917, 39 Stat. 1132, § 4. In addition, it provided that U.S. Customs officials would assist in the enforcement of those laws.

 The Organic Act of 1936 continued the historical tradition of customs laws being enforced in the Virgin Islands on an individual basis, that is, separately from the United States or other United States possessions. 1 V.I.C., Organic Act of 1936, 49 Stat. 1816, §§ 35 and 36. It followed the provisions of the Tariff Act of 1930, still in force, which specifically define the United States Customs zone as *excluding* the U.S. Virgin Islands. 19 U.S.C. § 1401(h) (1980). The Revised Organic Act of 1954 continues to provide for the levying and collection of duties by the United States government, and the return to the Virgin Islands Treasury of all sums collected, less the

---

[4] As indicated infra, p. 38, a "border search" by customs officials is a further exception to the search warrant requirement. United States v. Chaplinski, 579 F.2d 373, 374 (5th Cir.), cert. denied, 439 U.S. 1050 (1978).

cost of collection.[5] 1 V.I.C., Revised Organic Act *of 1954, 68 Stat. 497, § 28.*

We turn now to the question of defendant's flight from San Juan to St. Croix. The defense maintained that defendant's flight was not subject to customs requirements since the point of origin and the destination were both locations under the United States flag.

This argument, however, ignores the codification of United States law, cited herein, which establishes the separation of the Virgin Islands from all other U.S. possessions, the mainland, and foreign countries for customs purposes. Thus, pursuant to 19 C.F.R. § 6.25(b), flights transporting merchandise from the 50 states, or from Puerto Rico, to the Virgin Islands, are subject to "shipper's export declarations" codified in pertinent provisions of 15 C.F.R. Part 30.

In addition, various documentation for customs purposes must be supplied by shippers (in this case a private plane with cargo), pursuant to 15 C.F.R. § 30.1(a)(1)(iii), "to the Virgin Islands of the United States from the United States or Puerto Rico." Thus, Inspector Nielsen's statement at the hearing that the defendant was required to file the various documents (he failed to do so) was correct.

██ ██ At a border, customs agents need not have a reasonable or articulable suspicion that criminal activity is involved to stop a person who has traveled from a foreign point, examine his or her credentials and search luggage and personal effects for contraband. United States v. Chaplinski, 579 F.2d 373, 374 (5th Cir.), cert. denied, 439 U.S. 1050 (1978). Border searches by customs officers may be based on reasonable, rather than probable, cause and without the necessity of a warrant. United States v. Bilir, 592 F.2d 735, 739 (4th Cir. 1979).

In the proof at hand, however, the Court finds that Inspector Nielsen had probable cause to conduct the search and testing based on the following evidence:

(1) The airplane landed after midnight at a closed airport.

(2) It came to a stop, not at a passenger disembarkation point or at the area reserved for private aircraft, but at the American Airlines cargo area, although it was clearly not an American Airlines plane.

(3) The pilot admitted he had no clearance to land, had none of the documentation required, and had filed no flight plan.

---

[5] See also § 68 of Title 19 which authorizes the construction of facilities in the Virgin Islands to aid in the enforcement of customs and immigration laws of the United States. 19 U.S.C. § 68 (1978).

(4) Bundles of packages were clearly visible to the Inspector from his position on the ground.

Inspector Nielsen's suspicions were aroused by the totality of this information, and he asked permission to further inspect a package. The pilot agreed (although he stated at oral argument this was because he felt he had no other choice). The package was inspected, tested, and found to contain a controlled substance. The arrest followed.

The Court finds that the pilot agreed, more inferentially because he knew he was dealing with an experienced custom's officer, than because he was under duress. Although he told Officer James he did have permission to land, when he was confronted by Inspector Nielsen he told the truth: he had no permission, no flight plan, no customs clearance and no documentation. Obviously, defendant knew he was in a different ball game. His consent was more probably based on realization of this fact than the consideration that, being surrounded by police officers, he had no other choice. He knew opportunities for obfuscation were at an end.

██ In any event, the inspector needed no permission from the pilot. The law gave him permission to inspect the pilot's plane and contents, whether "personal baggage" as the pilot originally maintained, or as "cargo".

## CONCLUSION

It is clear from the evidence that the Public Safety Officers and the Customs Inspector each had probable cause for his respective separate actions, even though the Customs Inspector is not held to as rigorous a standard as the police officers. That finding having been made by the Court, defendant's motion to suppress the evidence thus seized will be denied.

## ORDER

THIS MATTER came before the Court on motion of the defendant to suppress certain items seized in a search of defendant's airplane during the evening of December 22–23, 1981. A hearing having been held, evidence having been received, the Court having filed its Memorandum Opinion containing its Findings of Fact and Conclusions of Law, and the premises considered, now therefore it is

ORDERED:

THAT, the motion of the defendant be, and the same is, hereby DENIED.