**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**RASOKEMO E. ARCHIBALD, Defendant**

Case No. ST-07-CR-418

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

September 11, 2008

75

76

77

78

NOLAN D. PAIGE, ESQ., Assistant Attorney General, Department of Justice, St. Thomas, USVI. *For Plaintiff.*

ROBERT A. LEYCOCK, ESQ., Territorial Public Defender, St. Thomas, USVI. *For Defendant.*

DUNSTON, *Judge.*

## MEMORANDUM OPINION

(September 11, 2008)

### INTRODUCTION

This matter came before the Court on May 27, 2008, for a hearing on Defendant's Motion to Suppress seeking exclusion on Fourth Amendment grounds of marijuana seized from his person and marijuana and packaging material later taken from a vehicle to which Defendant had the keys following warrantless searches conducted on October 23, 2007. For the reasons that follow, the Motion will be granted.

## Facts

Special Agent Eric Lee ("Lee"), who has sixteen (16) years of experience as a police officer, the last three (3) of which have been with the U.S. Drug Enforcement Administration ("DEA"), testified at the suppression hearing that on October 27, 2007, that he, other employees of the DEA and other federal law enforcement agencies, and the Virgin Islands Police Department ("VIPD") were "participating in an on-going enforcement operation" targeting "high drug areas, high crime areas" including the vicinity of the Lima Superette convenience store in Estate Bovoni, St. Thomas, Virgin Islands. He stated that the operation was being conducted because on the previous evening officers had confiscated a weapon and "other contraband at that location.

At approximately 3:00 p.m. Agent Lee and "several" other agents and officers, some of whom were in police uniform and some of whom wore other "police identifiers", arrived more or less simultaneously at the scene in several vehicles. Driving an unmarked vehicle and approaching from the East, Lee turned into the parking area, parked near the front entrance of the Superette, and emerged from the vehicle wearing a tactical "ballistic" vest with the word "Police" emblazoned on its front. Agent Lee then observed Defendant Rasokemo E. Archibald ("Archibald") look at him, quickly make a left turn, and walk "at a brisk pace" toward the laundry that is part of Lima's complex. Lee testified that based upon his "experience from the night before and intelligence that had been received prior to us starting this operation" his attention was drawn by Archibald's "demeanor" and "the abruptness of his action", whereupon Lee asked Archibald to stop, a request with which Archibald complied. Lee had Archibald place his hands against the wall and patted him down for weapons "because of the area he was in, and from my training and experience and also my experience from the night before, with us having found a weapon in the area".

When the frisk reached the area of Archibald's pockets Agent Lee stopped because "I heard what sounded like a plastic rustling sound" and that based on "the sound that I heard from the plastic rustling and the feel that I had once I hit the pockets, I thought that this was going to be contraband in his pocket, so I removed it." When asked what it was about the feel that made him think there was going to be "contraband", he explained that, "Not only just the feel for the fact that it was a solid

81

substance, but then also put that in conjunction with the sound of the plastic, having 16 years of law enforcement experience, to me that sounded like or felt to be contraband based on those factors right there." Lee removed a bag of marijuana from Archibald's pocket, arrested him, and completed the search of Archibald's person, finding no weapon or other illegal substances. At that point, he said "Agent Mark Thomas pretty much took over".

On cross-examination Agent Lee indicated that he did not see Archibald with a weapon nor see him commit any crimes "except possessing the marijuana" prior to the search, that he hadn't seen Archibald the night before, and that Archibald had not been arrested the on prior evening. He also testified that the location had been designated by the DEA and VIPD as a "high crime area" based upon a "number of incidents or calls" received by the police and information from "human intelligence and prior arrests in the area."

Agent Lee did not identify any specific "human intelligence" he possessed nor detail explicitly what it was about his "experience from the night before" that caused him to subject Archibald to a pat-down search. Lee did explain that Archibald's pace was "a more brisk pace than you would normally see", that Defendant was "more or less standing when I first noticed him", and that some other people in the area were "milling about and walking at a slower pace" than Archibald used in walking away. He also did not specifically identify what he thought he heard and felt in Defendant's pocket during the pat-down other than his description that it was "plastic rustling", "solid", and "contraband".

Detective Mark Thomas, Sr. ("Thomas"), testified that he assisted in the arrest of Archibald. He confirmed that a HIDTA task force made up of representatives of several federal agencies had come to the location as part of an initiative to "stem the tide of violent crimes that were occurring in the island at that time" and that intelligence had revealed that the area of the Lima Superette was a "hot spot" for the "illegal discharge of firearms and drug activity". The task force arrived in about ten (10) vehicles, approximately half of which were marked police cars, and Detective Thomas was in one of the last vehicles to approach the area. Upon arrival he saw Agent Lee walk up to Archibald and perform a frisk. Thomas stated neither Archibald nor any of the other persons in the area were smoking [marijuana] or firing shots prior to the pat down of Defendant, and that, "There was no illegal activity at the time."

Thomas also testified that he had frisked Archibald "for officer's safety" on the dark "east end" of the same area during the initiative the night before and that Archibald had not then had a weapon on him, although a firearm was recovered that night on the "western end" of the building. He also said that "drug evidence" was found in the area on the previous night, but that no arrests were made because it could not be linked to any individual.

After the arrest Thomas asked whether Archibald was driving any of the vehicles in the area, to which Archibald responded "no", but when asked again, Archibald pointed to a tan Toyota Camry. Detective Thomas testified that he asked Archibald for permission to search the vehicle and that Archibald verbally consented. He asked Archibald whether the vehicle contained any "contraband", to which Archibald replied, "Not that I know of." Archibald gave Thomas the keys to the Camry, the door was opened, a trained canine was brought to the car, and the dog got in the vehicle and alerted to the center console, which was then opened by Thomas, revealing five (5) bags of marijuana, a larger baggie of marijuana, and packaging material. Thomas said two partially smoked marijuana cigarettes were also found "in the ash tray". Thomas later learned that Archibald did not own the vehicle, which belonged to his boss.

At the police station, Defendant was advised of his rights and signed a written consent to search form. Thomas testified that no consent form was used prior to the vehicle search because he didn't have a consent in the field, although he did have an advice of rights form there, which Archibald was not asked to execute either. He also stated that the reason for the search of Archibald upon the arrival of the task force was "officer safety".

There was no testimony during the suppression hearing that Archibald or anyone ran from area when the officers approached, that any odor of marijuana was detected by any of the officers, or that anyone on the scene made any "furtive gestures" other than the movements of Archibald described by Agent Lee. Thomas gave no corroborating testimony in support of Lee's description of Archibald's movements prior to the pat-down search. There was also no testimony concerning the actions of any other individuals at the scene, no indication whether anyone else was arrested on this occasion, and no evidence whether any weapons or

controlled substances other than those linked to Archibald were recovered.

## LEGAL STANDARDS

### The Exclusionary Rule

■ The Fourth Amendment to the Constitution of the United States protects the right "of the people to be secure in their persons, houses, and effects, against unreasonable search and seizures . . ." Similarly, Section 3 of the Revised Organic Act of 1954, as amended, provides, "The right to be secure against unreasonable searches and seizures shall not be violated." The Supreme Court approved the exclusion of evidence as a sanction for violations of the Fourth Amendment in *Weeks v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914). The exclusionary rule was later extended to the States in *Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), and it has long been recognized as part of Virgin Islands jurisprudence. *See, for example*, *Government v. Thomas*, 5 V.I. 276, 286 (Mun. Ct. 1966) ("It is well settled that evidence obtained in violation of the Fourth Amendment may be suppressed on a motion made by a party who is aggrieved.").

### The Warrant Requirement

■■ Under these constitutional standards, the Court must determine whether a search or seizure is reasonable. Generally, searches conducted without a warrant approved by a neutral and detached judge are presumed to be unreasonable. *United States v. Chabot*, 19 V.I. 28, 531 F. Supp. 1063 (D.V.I. 1982); *Government v. Berry*, 11 V.I. 40, 385 F. Supp. 134 (D.V.I. 1974); *Karz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). When police act without a warrant, the probable cause requirement must be strictly enforced. *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959). In order to pass constitutional muster, a warrantless search must be shown to fall within one of the few narrowly defined exceptions to the warrant requirement. *Berry, supra*; *Government v. Fabiani-Ogno*, 20 V.I. 404 (Terr. Ct. 1984). However, while the Fourth Amendment ensures an individual's rights to be secure unreasonable search and seizures, it does not require a police officer to ignore a possible crime. *Chabot, supra*.

## Burden of Proof

■ Ordinarily, on a motion to suppress evidence, the burden rests upon the accused to establish that the evidence sought to be suppressed was illegally obtained. *Government v. Morton*, 15 V.I. 418 (Terr. Ct. 1978); *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980). However, once it is shown that a search or seizure was conducted without a warrant, the burden shifts to the People to demonstrate by clear and convincing evidence that the governmental activity fell within some recognized exception to the warrant requirement. *Morton, supra.*; *McDonald v. United States*, 335 U.S. 451, 69 S. Ct. 191, 93 L. Ed. 153 (1948); *United States v. Jeffers*, 342 U.S. 48, 72 S. Ct. 93, 96 L. Ed. 59 (1951).

## Stop and Frisk

■ Under the Fourth Amendment, probable cause is generally a necessary predicate to a police search or seizure. *Government v. Rodriguez*, 23 V.I. 386 (Terr. Ct. 1988). However, in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Supreme Court recognized an exception to this general rule, and to the warrant requirement, when police make a brief, limited stop and detention of an individual in order to question him concerning a suspected criminal offense. *Terry* held that a quick pat-down search for weapons can be conducted without a warrant and on less than probable cause as part of the investigative stop if based on a "reasonable suspicion" of criminal activity. In order to be valid under *Terry*, a pat-down search must be based on a reasonable belief that the person is armed and presently dangerous. *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979). In *Terry*, the court was careful to note that the stop and exception is "narrowly drawn." *Terry, supra*, at 27. The officer must be aware of specific articulable facts that give rise to a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *Government v. Rodriguez*, 23 V.I. 386 (Terr. Ct. 1988). To be reasonable, the suspicion must be based on objective facts *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979), rather than on "inchoate and unparticularized suspicion or 'hunch' ". *Terry, supra*, at 27.

■ This Court must apply a "totality of circumstances" analysis when deciding whether reasonable suspicion existed to conduct a *Terry* stop and

85

frisk. *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Under the test, "the totality of the circumstances — the whole picture — must be taken into account." *Id.*, at 417. The inferences of a trained officer may be considered, and probabilities, not certainty, govern. *Id.*

### "Plain Feel"

▮▮▮ Another well recognized exception to the warrant requirement is the plain view doctrine. Under the plain view exception, law enforcement officers are permitted to seize objects whose incriminating character is immediately apparent without a warrant if the officers are lawfully in a position to observe them. *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960); *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *Coolidge, supra.* The plain view doctrine has been extended to encompass observations made by lawful use of other senses, such as the "plain smell" of marijuana that police recognize based upon their training and experience *Johnson v. United States*, 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948); *Chapman v. United States*, 365 U.S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961); *Jones v. United States*, 357 U.S. 493, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958), or the "plain hearing" of incriminating remarks. *See, for example, United States v. Fisch*, 474 F.2d 1071 (9th Cir. 1973). And, by analogy, the Supreme Court has further extended this doctrine to include tactile sensations under the corollary of "plain feel". *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). In *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), the Court reiterated that police may seize contraband other than weapons detected through the sense of touch during a lawful protective pat-down search as long as the search stays within the bounds set by *Terry.*

### ANALYSIS

#### I. The pat-down

##### A. The feel question

In *Dickerson*, police officers observed the defendant leave a known crack house and, upon seeing the officers, abruptly halt and walk in the opposite direction into an alley, arousing the officer's suspicion. The police ordered Dickerson to stop, and one of them frisked him, feeling a

small lump in the front pocket of his jacket. The officer testified, "I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." *Id.*, at 369. The officer then reached into Dickerson's pocket and removed the bag, which contained crack cocaine. After the trial court admitted the cocaine into evidence, the Minnesota Court of Appeals found a valid stop but concluded that the officers exceeded the bounds of *Terry* in seizing the cocaine and that it should have been suppressed, a decision that the Minnesota Supreme Court affirmed.

In also affirming the appellate court's decision, the U.S. Supreme Court first discussed the limits of the plain view exception to the warrant requirement, indicating, "If . . . the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — *i.e.*, if its incriminating character is not immediately apparent — the plain view doctrine cannot justify its seizure." *Id.*, at 375. In applying that rule to Dickerson, the court noted that the officer did not claim he suspected the object was a weapon and that his testimony "belies any notion that he 'immediately' recognized the lump as crack cocaine. Rather . . . the officer determined that the lump was contraband only after squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket which the officer already knew contained no weapon." *Id.*, at 378.

The U.S. Court of Appeals for the Third Circuit recently explored the parameters of *Dickerson* and the plain feel doctrine in *United States v. Yamba*, 506 F.3d 251 (3rd Cir. 2007). There Officer Matthew Livingstone observed a driver holding an open pocket knife standing outside a parked U-Haul truck that was blocking an entrance to a gas station. Upon approaching, Livingstone saw two passengers in the truck making "quick and furtive gestures" below the dashboard and toward their pockets. When asked what he was doing, the driver indicated that he and the passengers were delivering furniture and, upon further inquiry, the driver consented to a search of the truck. After being erroneously informed by the dispatcher that there was an outstanding warrant for the driver, Livingstone handcuffed him and put him in the police car. The officer then asked Yamba and the other passenger to step out of the truck, patted Yamba down, and felt a plastic bag in Yamba's jacket pocket. Livingstone testified, "I noted through training and experience [that] narcotics are stored and transported in plastic baggies. After a second of just feeling it,

I could tell that there was a soft spongy-like substance that is consistent with marijuana inside. I then recovered the bag from his pocket and found it contained suspected marijuana." *Id.*, at 254. The officer then arrested Yamba.

Yamba argued that he was illegally seized by Livingstone and that Livingstone's search exceeded the scope of *Terry*. Relying on the unusual position of the truck, the weapon in the driver's hand, the "quick and movements" of the passengers, and the report of an outstanding arrest warrant for the driver, the court concluded Livingstone was justified in believing Yamba was armed and presently dangerous.

In so holding, however, the Third Circuit stated:

> In *Terry*, the Supreme Court said that "[t]he scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." . . . It later expounded on that statement when speaking about *Terry* searches specifically:
>
>> "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose."
>
> *Yamba, supra,* at 257-58. (emphasis in original) (internal citations omitted)

Importantly, in analyzing *Dickerson*, the Third Circuit rejected "a narrow focus on how quickly and certainly the nature of an object felt during a *Terry* search is known and on how much manipulation of a person's clothing is acceptable", but instead said the linchpin of the decision was that the officer already knew Dickerson's pocket contained no weapon he felt the object inside. *Id.*, at 258-59.

> The proper question under *Dickerson*, therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concluded that it is not a weapon. That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be con-

88

fiscated if spontaneously discovered during a properly executed *Terry* search. Moreover, when determining whether the scope of a particular *Terry* search was proper, the areas of focus should be whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk . . .

Assuming an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons. He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon. If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search. If, indeed, he discovers contraband, the office may seize it, and it will be admissible against the suspect. If, however, the officer "goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed."

*Id.*, at 259-60. (internal citations omitted)

Thus, presuming a valid *Terry* pat-down, in deciding whether Agent Lee's action in removing the marijuana from Archibald's pocket was appropriate under the plain feel doctrine, the Third Circuit's holding compels the Court to determine at what point Lee concluded Archibald was not armed and at what point Lee had probable cause to believe the object he felt was contraband.

The test dictated by *Yamba* is, from This Court's perspective, ultimately more difficult than the analysis required by *Dickerson*. As the Third Circuit pointed out, *Dickerson* demands examination of an officer's thought process to calculate the immediacy and certainty with which the officer knows an object to be contraband, coupled with a somewhat more objective judgment regarding the amount of manipulation required to acquire that knowledge. On the other hand, *both* questions in *Yamba* compel largely subjective analysis of the officers' thinking. Each of the two cases necessitates a remote, after the fact, examination of the thoughts and impressions formed by a law enforcement officer while in the brief and often stressful process of conducting a pat-down of one he

suspects to be armed and engaged in criminal conduct. The determination of the point at which a policeman forms certain mental impressions or reaches definitive conclusions is likely to be imprecise. And, those decisions must be made based on limited information and, often, poorly described factors presented in brief testimony at a suppression hearing. This quandary leaves the Court far from certain that it can proceed with substantial confidence that it has appropriately balanced the constitutionally protected rights of the individual and the Government's legitimate obligation to enforce the law in making such a close call that may turn on a single phrase.

Agent Lee testified that when the pat-down reached the area of Archibald's pockets he stopped because he "heard what sounded like a plastic rustling sound" and that based on "the sound that I heard the plastic rustling and the feel that I had once I hit the pockets, I thought that this was going to be contraband in his pocket, so I removed it." When asked what it was about the feel that made him think there was going to be "contraband", he explained that, "Not only just the feel for the fact that it was a solid substance, but then also put that in conjunction with the sound of the plastic, having 16 years of law enforcement experience, to me that sounded like or felt to be contraband based on those factors right there." Because of "the area" and his "training and experience", Agent Lee said he thought Archibald had contraband on his person and that he believed the object he felt was contraband because it was a "solid substance" and had the "sound of plastic".

Agent Lee did not provide the Court with substantial testimony establishing his qualifications to identify controlled substances by touch other than to say that he was in law enforcement for 16 years, the last 3 of which were with the DEA. While he presumably received training and had accumulated experience specific to drug identification during that lengthy period, there is nothing in the record specifically demonstrating he had such training or experience or that it extended to feeling such objects through clothing. Nor did he indicate that on any prior occasion he had identified a controlled substance by the sense of touch.

Perhaps this illustrates why not every court that has considered "plain feel" has found it to be reliable. In *State v. Broadnax*, 98 Wash.2d 289, 654 P.2d 96 (Wash. 1982) an officer who the defendant at premises where a drug warrant was being executed felt a soft bulge in the defendant's pocket, removed it, and discovered that it was a balloon of heroin. In

holding that probable cause for the search was lacking, the court observed:

> The tactile sense does not usually result in the immediate knowledge of the nature of the item. The officer in this case could not know that the bulge was a balloon of heroin. His observations lacked "the distinctive character of the smell of marijuana or the hardness of a weapon." . . . A soft bulge in the shirt pocket is not alone sufficient to find probable cause to arrest.

*Id.*

Also troublesome to the Court is Agent Lee's general characterization of the object he felt as "contraband". He specifically did not say that he recognized the package he felt in Archibald's pocket to be a bag of marijuana or any other drug. He also did not specifically identify what he thought he heard and felt in Defendant's pocket during the pat-down other than to note it was "plastic rustling", "solid", and "contraband". While it may be inferred his testimony that his training and experience led him to the conclusion that the solid object contained in rustling plastic was some kind of illegal substance, he did not explicitly indicate how his training and sense impressions led to that conclusion. Nor did he explain how the training permitted him to decide what the "contraband" was. Of course, the officer did not have to be absolutely certain that the object he felt was a particular controlled substance. But the general description of the item as "contraband" encompasses such a wide range of materials, of varying compositions and textures, as to invite both speculation by the Court regarding the officer's thought process and judicial creation of an avenue for abuse by other, less veracious officers who may merely repeat a "liturgy of plain feel" in order to justify general explorations of the persons of those they confront on the street.

Based on Agent Lee's indication that when the reached Archibald's pockets he "heard what sounded like a plastic rustling sound" and that based on "the sound that I heard from the plastic rustling and the feel that I had once I hit the pockets, I thought that this was *going to be* contraband", it appears to the Court that the Lee discerned that the object was not a weapon *before* he decided it was "contraband". Regardless of whether feeling something Lee described as "plastic rustling", "solid", and "contraband" gave him probable cause to believe the object in

Archibald's pocket was "contraband", it clearly did not, at that point, cause him to believe that the object was a weapon. Under the facts presented, a conclusion as to which impression ["contraband" or "not a weapon"] was formed first, is not one that the Court can readily determine. However, given that *Yamba* requires a valid *Terry* stop as a threshold to the analysis of the officer's sense impressions, it turns out that is not a decision the Court needs to make here.

## B. The *Terry* question

■ Before reaching the "plain feel" issue, the Court must first determine whether the information available to Agent Lee at the time of the seizure of Defendant and the search of his person rose to the level of reasonable suspicion to justify a brief investigatory stop and pat-down search. As stated in *Terry*, ". . . in justifying the particular intrusion the police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*, 392 U.S. at 21. Reasonable suspicion entails some minimal level of objective justification for making a stop, that is, something more than inchoate or an unparticularized suspicion or a hunch but less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 8-9, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). As the Supreme Court noted, "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, *supra*, at 27.

■ Moreover, the Supreme Court has clearly stated that the purpose of a *Terry* stop is to search for weapons. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . ." *Adams v. Williams*, 407 U.S. 143, 145-147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). A *Terry* protective search must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. *Terry*, *supra*, at 26. If the protective search goes beyond those acts necessary to determine whether the suspect is armed, it is no longer valid under *Terry* and the fruits of the search will be suppressed. *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968).

■ Agent Lee had Archibald place his hands against the wall and patted him down for weapons "because of the area he was in, and from

my training and experience and also my experience from the night before, with us having found a weapon in the area". It is by analyzing these and other factors preceding the stop, taken together as the totality of the circumstances, that the Court has determined that Agent Lee acted without reasonable suspicion to conduct an investigatory stop and a warrantless frisk of Defendant.

### i. Citizen complaints and anonymous telephone calls

Lee said that, in addition to Archibald's "demeanor" and "the abruptness of his action", his attention was also drawn to Archibald because of "intelligence that had been received prior to us starting this operation". Agent Lee stated that the designation of the area around the Lima Superette as a "high crime area" was based upon a "number of incidents or calls" received by the police and information from "human intelligence and prior arrests". Detective Thomas also indicated that intelligence had disclosed that the area was a "hot spot" for the "firearms and drug activity".

██ ██ Generally, an anonymous tip, without more, is insufficient to justify a police officer's stop and frisk of a suspect. *Florida v. J.L.*, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000). The U.S. Supreme Court has held that, while anonymous tips are generally less reliable than tips from known informant, they can rise to the level of reasonable suspicion if there are other factors contributing to the basis for an investigatory stop. *Id.*, at 269. In *Alabama v. White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990), the court held that independent police work can provide an anonymous tip with sufficient indicia of reliability to provide reasonable suspicion for a constitutional investigatory stop. Similarly, in *Government v. Rijos*, 6 V.I. 475, 285 F. Supp. 126 (D.V.I. 1968), the District Court held that an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge. Complaints of ordinary citizens are ordinarily afforded greater weight than those of informants.

Here, the People's presentation on the motion to suppress was largely lacking in details regarding the citizen complaints about the area other than to indicate they reported firearm and drug activity. No specifics were given during the hearing about previous incidents in the area of the

Superette [other than the seizures on the previous night] that led to the conclusion that an operation of the type conducted by the task force was justified or designed to address those citizen complaints. Nor was there any indication of any temporal proximity between the citizen reports to the police operation.

The prior designation by the police of the vicinity as a "high crime" area, although demonstrative of the need for frequent patrols by the police, does not obviate the need for specific and articulable facts to justify Agent Lee's supposed heightened suspicion that criminal activity was afoot when Archibald was confronted on this particular occasion. While Agent Lee alluded to "prior arrests" as a basis for the high crime area designation, he did not indicate whether he meant that persons had been arrested near the Superette or that persons arrested elsewhere had provided intelligence that drug and weapons could be found in the vicinity of Lima's. Of note is the fact that no one was arrested on the previous evening. Additionally, some discussion of details regarding the "human intelligence" upon which the officers acted would have been helpful to the Court in determining the appropriateness of such a massive response as the officers' raid on that locale on October 23, 2007. One would expect such an operation to be based on fresh and specific information about particular criminal activity, but no such testimony was presented to the Court.

The Court is mindful that the testimony established that an operation was conducted by members of this task force in the same parking lot on the previous night, and that a weapon and unspecified "drug evidence" were recovered at that time. However, Lee testified that he did not see Archibald there on that occasion. While Detective Thomas established that Archibald was in fact present during the previous night's police activity, there is nothing in the record that links him to the "drug evidence" or weapon found on that occasion. On the contrary, the fact that Defendant was frisked on October 22, 2007, by Detective Thomas and found not to be in possession of either a firearm or drugs would, rather than create heightened suspicion in the mind of Agent Lee, appear to make it *less* likely that Archibald possessed a dangerous weapon or contraband on October 23, 2007. Thus, in the absence of any evidence linking them Defendant, the Court must give little weight to the seizures of the previous evening in determining whether there was reasonable suspicion for a frisk.

## ii. Knowledge and independent observations of the officers

The Third Circuit has ruled that when "determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *United States v. Rickus*, 737 F.2d 360, 365 (3rd Cir. 1984). Agent Lee, who had sixteen years of law enforcement experience, indicated that after looking at him Archibald made a left turn and walked "at a brisk pace" toward the laundry. Lee testified his attention was drawn by Archibald's "demeanor and abruptness" and that the abruptness of Archibald's and the brisk pace at which Archibald had walked caused him to frisk Archibald for weapons.

The Supreme Court has indicated that flight upon sighting a police officer is not *per se* indicative that criminal activity is afoot, but has also recognized that nervous and erratic behavior is a pertinent factor in determining whether there is reasonable suspicion to conduct a an investigatory stop. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). Unprovoked flight from a crime scene may be considered as a factor in deciding whether reasonable suspicion exists. *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). *See also People v. Samuel*, 46 V.I. 177 (Super. Ct. 2005) (officer who noted, based on 16 years of experience, that suspects often run if they are engaged in criminal activity, was justified in conducting limited pat-down for own safety).

This case is distinguishable from those involving flight, since Agent Lee's interpretation of Defendant's actions is less damning. Archibald did not run from Agent Lee. His actions were, apparently, somewhat akin to those viewed as a *Terry* stop in *Dickerson*, albeit in the vicinity of a convenience store rather than a crack house. On the other hand, while walking briskly away from one member of a large contingent of law enforcement officers may suggest suspicious activity, especially to an experienced and highly trained law enforcement official, it is significant that Archibald had been stopped and frisked by Detective Thomas the previous night at the very same location. Against this background Defendant's actions are more consistent with a simple desire to avoid another unpleasant confrontation with, and search by, the police. Defendant's actions were certainly an appropriate factor for consideration by Agent Lee, but the reason for Archibald "abruptly" walking away from

him is capable of numerous, contradictory interpretations. Notably, Agent Lee did not testify that Archibald's turning and walking away caused him to believe Archibald was armed and dangerous.

### iii. Safety of the police officers

██ The purpose of a *Terry* frisk is to allow police officers to continue their investigatory stop of a suspect without fear of violence. *Adams supra* (tip by known informant that person was carrying a gun at his waist and narcotics justified officer's investigation and limited search for the gun). In *Terry* the Court indicated,

> where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own and others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault him.

Some courts have noted that there is a direct correlation between the presence of drugs and the presence of firearms and have observed that individuals carrying drugs are likely to be armed as well. *See, for example, J.L., supra,* at 273. Other jurists, like Justice Harlan in his concurring opinion in *Sibron v. New York,* 392 U.S. 40, 64, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) disagree:

> [A]lthough I think that, as in *Terry,* the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed, it is not clear that suspected possession of narcotics falls into this category. If the nature of the suspected offense creates no reasonable apprehension for the officer's safety, I would not permit him to frisk unless other circumstances did so.

In this case, Agent Lee did not detail any information that would lead to the conclusion that Archibald had either drugs or a firearm on his person on October 23, 2007. No odor of marijuana or observation of Archibald's use, possession, or disposal of drugs was described by the officers.

While the Court must employ the analysis set forth in *Yamba*, the facts of that case are substantially dissimilar to this one. In *Yamba*, relying on the unusual position of the truck, the weapon in the driver's hand, the "quick and furtive movements" of the passengers, and the report of an outstanding arrest warrant for the driver, the Court concluded Livingstone was justified in believing Yamba was armed and presently dangerous. Acting alone, Officer Livingstone was outnumbered when he approached the truck and faced three persons, one of whom was holding a weapon and for whom there was a report of an outstanding warrant. By contrast, Lee was part of a large task force, at least some of whom were wearing bullet proof vests, who descended upon the Bovoni Superette in some ten (10) vehicles. There was no testimony that anyone other than Archibald was stopped or frisked. No weapons or suspicious activity were observed upon the officers' arrival, and there were no reports of outstanding warrants for Archibald or others at the scene. Officer Livingstone observed Yamba and the other passenger make furtive gestures under the dashboard of the truck and in their pockets, such that at times he could not see their hands. Archibald's only "furtive" activity was to turn and walk away from one of a small army of approaching police officers, one of whom had searched him the night before. While Lee stated he also relied on Archibald's "demeanor", he did not describe Archibald's deportment other than to say Archibald's pace was "a more brisk pace than you would normally see".

 The plain feel doctrine permits an officer properly patting down a suspect in the course of a valid *Terry* frisk for weapons to seize an object whose contour and mass make it immediately apparent the object is a weapon. *Dickerson, supra.* That is not the situation that occurred here. This is not a case, like *Terry*, where one or two police officers happened by chance to observe suspicious behavior and were drawn to investigate it, rightfully feeling the needed to protect themselves from an unknown suspect who might potentially be armed. Here, the facts suggest Agent Lee and the task force went to the location of the Superette intent on confronting those, like Archibald, whom they already believed were engaged in criminal activity, regardless of whether those persons acted furtively or not. Upon their arrival at the scene the officers observed no suspicious activity such as the odor of marijuana, persons smoking marijuana, suspected drug sales, or the display or discharge of firearms or other weapons. As Detective Thomas stated, "There was no illegal activity at the time." Lee did not see Archibald with a weapon nor see him

commit any crimes prior to the search. He hadn't even seen Archibald the night before, and Archibald had not been arrested for any criminal activity on the prior evening. The police may well have had information prior to their arrival at Lima's that caused them to believe that Archibald was an armed drug dealer. They did not, however, present evidence of such knowledge at the hearing.

 What Lee observed was simply an adult Rastafarian male in a public place, where he had every right to be, who turned and walked away from one of a phalanx of approaching police officers in tactical gear, after being searched in the same location the previous night by one of their number. To justify Agent Lee's frisk of Archibald "for officer's safety", Lee was required to have a reasonable belief that Defendant was armed and presently dangerous. Detective Thomas indicated that the alleged concern of the officers for their safety arose from the fact that a weapon was recovered from the area the night before, an event that had long passed and for which there was no connection to Archibald. "[A] suspicious look and a gut feeling, without more, do not provide reasonable suspicion that a person may be armed." *United States v. Hall*, 193 F. Appx. 125 (3rd Cir. 2006) (not precedential). "[O]fficers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch' or on circumstances which 'describe a very broad category of predominantly innocent [persons] . . .' " *United States v. Campbell*, 843 F.2d 1089, 1093-94 (8th Cir. 1988).

Based upon the presence of so many officers in a public place where no criminal activity was underway, based upon the fact that Lee's immediate action upon arrival was to place Archibald against the wall to search him, and based upon the frailty of alleged justifications for the search put forth by Agents Lee and Thomas, the Court must conclude that the People did not establish by clear and convincing evidence the presence of "specific and articulable facts which, taken together, with rational inferences from those facts, reasonably warrant[ed]" subjecting Archibald to a pat-down search. *Yamba, supra*, at 256.

Support for this conclusion is also provided by the decision in *Rodriguez, supra*, in which a former judge of this Court held that officers did not make a valid *Terry* stop of an individual who had fled from them the night before after they inquired whether he had a weapon. As Judge Finch noted:

Nothing in the instant case suggests that Rodriguez was suspected of committing, preparing to commit, or even had committed any crime . . . Mere flight to avoid police interrogation is nowhere mentioned in our criminal code. People are ordinarily free to ignore police interrogation. Christian mentioned nothing unusual about the behavior of Rodriguez on the night he was stopped. In short, Rodriguez was stopped, not for suspicion of criminal activity, but for exercising his lawful right to flight. This absence of suspicion is critically fatal to the propriety of the officer's actions.

This Court is not at all disturbed by the fact that Rodriguez had a bulge in his shirt, and that he was in a high crime area. If any person walking in a high crime area, with a bulge in his shirt, can be stopped and frisks by police, the Fourth Amendment is utterly meaningless. It is true that the officers, after having placed themselves in close proximity to Rodriguez, may have had a reasonable fear for their safety. But they had no right to insist on the encounter, especially since there is no indication that the bulge resembled a weapon.

*Id.*, at 390

In rendering this decision, the Court does not wish to dissuade the law enforcement community from confronting suspects on the street or conducting appropriate tactical operations aimed at combating known or suspected criminal activity. However, in explaining their actions police officers need to be prepared to provide the Court with specific and sufficient justification for their beliefs and activities rather than making vague, conclusory recitations of key "buzz words" taken from legal opinions. This is not to say that the police need to reveal all of their intelligence or identify their informants and other sources of information that lead them to conclude illegal activities are being carried on by known individuals at particular locations. To gain the Court's imprimatur for their operations in the face of motions to suppress, however, they need to present evidence in sufficient detail to persuade the Court that they were acting within the confines of the Constitution.

■ The Court is here attempting, as the Supreme Court did in *Terry*, to strike a delicate balance between affording some flexibility to the police in investigating and preventing crime while at the same time protecting the rights of individuals to be free from unreasonable government intrusions. As the Supreme Court has stated:

> The heart of the Fourth Amendment . . . is a severe requirement of specific justification for any intrusion upon protected personal security. . . Acquiescence by the courts in the compulsion inherent in the field interrogation practices . . . would constitute an abdication of judicial control over, and indeed an encouragement of, substantial interference with liberty and personal security by police officers whose judgment is necessarily colored by their primary involvement in "the often competitive enterprise of ferreting out crime."

*Terry, supra,* at 11-12.

In this instance, the Court feels that balance favors suppression.

## II. The Vehicle Search

Having found that the initial pat-down of Archibald was not conducted within constitutional limits, the Court must now turn its attention to the search of the vehicle. The People argue that the search was valid because Archibald gave his consent.

█ A search with the consent of the accused has also been recognized as an exception to the warrant requirement. *Government v. Gereau,* 502 F.2d 914, 11 V.I. 265 (3rd Cir. 1974). In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the U.S. Supreme Court distilled its prior decisions on consent to conclude that, in order to be constitutionally valid, a consent to search must be voluntary. The Court there held that the question of whether consent to a search was voluntary or was the product of duress or coercion, express or implied, is a question of fact.

█ The determination of whether one's consent to a search is voluntary or the product of coercion must be made from the totality of the circumstances. *Id.; Berry, supra.* Among the circumstances the Court should consider are the nature of the police questioning, the suspect's subjective state of mind, and the presence or absence of probable cause to arrest or search the suspect. *Berry, supra.* The Government bears the burden of proving voluntariness. *Bumper v. North Carolina,* 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968).

█ Because the search of Archibald's person was preceded by an impermissible seizure, the Court finds that Defendant's "consent" was infected by an unlawful detention. Admittedly, Archibald is an adult and appears to be perfectly capable of giving valid consent to a search. No

100

evidence of verbal or physical threats made to Defendant was presented at the hearing. On the other hand, there was substantial evidence suggesting the coercive character of the request for consent. Defendant had been walking in front of convenience store when ten vehicles filled with law enforcement officers swooped into the parking lot. The officer who emerged from the closest to Archibald immediately ordered him to stop, had him place his hands against the wall, and frisked him, recovering what later proved to be marijuana from his pocket. Agent Lee testified that upon finding the contraband he placed Archibald under arrest, even before completing the pat-down. Within moments of the arrest, while Archibald was still being confronted by Agent Lee, Detective Thomas asked Defendant whether he was driving any of the vehicles in the area, and, despite Archibald's indication that he was not, Thomas promptly asked a second time, after which Archibald pointed to a tan Toyota Camry.

There was substantially more testimony at the suppression hearing concerning the manner in which the vehicle search was carried out than describing how Archibald's consent was obtained. When asked what happened after Archibald pointed out the car, Thomas answered, "I asked him if there was any — I asked him if I could search the vehicle and he told me, yes." Thomas then asked "if there was any contraband or anything in the vehicle that we would know of, he said not that he knew of." Archibald then "retrieved the keys for the vehicle out of his pocket", the car was opened, and the canine accompanying the task force was employed.

Once again, no details were provided by the Government regarding why Detective Thomas asked Archibald whether he had been operating a vehicle on that day or why, after Archibald initially denied that he had been, the agent felt compelled to ask him a second time. Nor was there any testimony concerning the proximity of the vehicle to Archibald when he was arrested or other facts that would have caused the detective to believe Archibald had operated a car.

 Nothing presented at the hearing demonstrated that prior to the vehicle search Defendant was advised that he had a right not to consent or that he knew his consent was not required. Clearly, neither such a warning nor knowledge by the accused that he need not consent was required. *Schneckloth, supra.* However, the absence of a warning or proof

of such knowledge is a factor that may be considered by the Court in determining voluntariness. *Id.*

A written consent form was signed by Defendant, but that did not occur until after the vehicle was searched and Archibald was taken to the HIDTA office following discovery of the drugs. Detective Thomas indicated that the officers did not have a consent form with them on the scene, but the Court is not persuaded that the officers would have employed such a form even were one present. Tellingly, the agents *did* have an advice of rights form with them at Lima's but chose not to have Archibald execute it on the scene.

The vehicle, it turns out, was not owned by Archibald but belonged to his employer, and Archibald was merely using the vehicle to pick up a case of water. The police did not impound the car after the search, but left it in the parking lot in Bovoni. When taken together with Defendant's response that there was no contraband in the vehicle that "he knew of" and the fact that most of the drugs and packaging were found inside a closed console, these facts are consistent with lack of knowledge by Archibald of the presence of contraband in the vehicle. Detective Thomas said the police also found two partially smoked marijuana cigarettes in an ashtray of the vehicle, but no testimony of the presence of marijuana in the ashtray presented at the probable cause hearing. Nor was there testimony regarding whether the ashtray was near the driver's seat, whether it was covered, or whether its contents were openly visible to the driver. Assuming the ashtray was located in the console and readily accessible to the driver, it appears entirely incongruent to the Court that a trained drug-sniffing canine would alert on a closed console rather than two partial joints allegedly lying in an open ash tray in the same portion of the car. Additionally, no forensic evidence was presented linking Defendant to any of the contraband.

The prosecution's "burden of proving that the consent was, in fact, freely and voluntarily given . . . cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Johnson, supra*. Against this background, the Court cannot conclude that Archibald's alleged consent to the search of the vehicle was "an intervening act of free will" and that the connection between his arrest and the consent had "become so attenuated as to dissipate the taint" so as to render Defendant's consent voluntary. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L.

Ed. 2d 441 (1963). As a result, the items seized from the vehicle are inadmissible as the fruit of the unlawful search. *Id.*; *Sibron, supra.*

## CONCLUSION

After careful deliberation and with the knowledge that alleged Fourth Amendment violations must be carefully scrutinized in order to protect individual rights from unwarranted search and seizures, the Court has determined that, under the totality of the circumstances, the People have failed to establish by clear and convincing evidence that the agent in this case had reasonable suspicion to believe Archibald was presently armed and dangerous so as to permit him to legally conduct an investigatory stop and frisk of Defendant. Additionally, the Court has determined that there was insufficient evidence presented at the suppression hearing to demonstrate that Archibald's consent to the search of his vehicle was voluntary. As a result, Defendant's motion to suppress is granted.