**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**ANTIONE R. MAGRAS (D.O.J. 01-25-89), DOMINIK J. LIMA (D.O.B. 12-21-90) and LEROY G. HENRY, JR. (D.O.B. 06-11-91), Defendants**

Crim. Nos. F297/2009, F298/2009, F298/2009

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

March 26, 2010

3

4

MICHAEL MOTYLINSKI, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, USVI, *Attorney for the Plaintiff.*

ROBERT A. EBERHART, ESQ., Law Offices of Robert A. Eberhart, St. Thomas, USVI, *Attorney for Defendant Leroy Henry, Jr.*

SAMUEL JOSEPH, ESQ., Office of the Territorial Public Defender, St. Thomas, USVI, *Attorney for the Defendant Antione Magras.*

HENRY C. SMOCK, ESQ., Smock & Moorehead, St. Thomas, USVI, *Attorney for the Defendant Dominik Lima.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

(March 26, 2010)

These matters came on for a hearing, Friday, November 6, 2009, on Defendants' respective Motions to Suppress. Defendant, Antione R. Magras, (hereinafter "Defendant Magras"), appeared and was represented by Samuel L. Joseph, Assistant Territorial Public Defender; Defendant, Dominik J. Lima. (hereinafter "Defendant Lima"), appeared and was represented by Henry C. Smock. Esq.; Defendant, Leroy G. Henry, Jr., (hereinafter "Defendant Henry"), appeared and was represented by Robert Eberhart, Esq. The People appeared through the V.I. Department of Justice, Michael Motylinski, Assistant Attorney General.

## I. FACTS AND PROCEDURAL BACKDROP

On June 19, 2009, at approximately 10:00 p.m., Officer Francis Brooks and Sergeant Elton Grant, while patrolling the Skyline Drive area, in a marked vehicle, observed a silver, four-door, Suzuki Esteem, registered to Defendant Henry, exiting the "lookout" area and proceeding onto Skyline Drive. Officer Brooks, the driver of the marked vehicle, slowed down and allowed the Suzuki to exit the "lookout" area and turn left in front of him. As both vehicles proceeded north, Officer Brooks observed the Suzuki make a right turn onto Louisenhoj Castle Road without stopping at a posted stop sign. Following close behind, Officer Brooks observed that the driver of the vehicle also failed to stop at the next posted stop sign, as he veered left heading towards "Drake Seat." Having witnessed the aforementioned traffic violations, Officer Brooks turned on his blue strobe lights, siren and high beams to pull over the vehicle for a "traffic stop."

Instead of immediately stopping his vehicle, Defendant Henry continued to drive further into the darkened road. After the vehicle finally came to a stop, Officer Brooks ordered Defendant Henry to exit the vehicle and produce his license, registration and proof of insurance. Observing a total of three (3) occupants in the vehicle, their furtive movements and the inordinately long period of time Defendant Henry took to emerge from the vehicle with the requested documents, Officer

8

Brooks and Sergeant Grant requested "back-up." When Defendant Henry finally approached Officer Brooks with the requested documents, he (Defendant Henry) appeared nervous. When asked about the other occupants in his vehicle, Defendant Henry replied, "I don't know their names, I just gave them a ride." Given the foregoing, Officer Brooks' suspicion heightened. Furthermore, while communicating with Defendant Henry, Officer Brooks observed that Defendant Magras, the front seat passenger, and Defendant Lima, the rear seat passenger, continued to move around inside the vehicle. Based on his twenty-two (22) years of experience in law enforcement, Officer Brooks concluded that the Defendants were trying to hide or conceal something.

For safety reasons, Officer Brooks ordered Defendant Henry to lie facedown on the ground with his arms spread apart while positioned between the front bumper of the patrol unit and the rear bumper of his vehicle. Defendants Magras and Lima were also ordered to exit the vehicle and lie similarly on the ground juxtapositioned to Defendant Henry. While the Defendants were lying on the ground, Sergeant Grant positioned himself behind the patrol unit's opened front side passenger door and pointed an assault rifle at the Defendants until back-up arrived.

After additional officers arrived, Officer Brooks "patted down" and/or "frisked" the Defendants for weapons in the interest of officer safety. During the "pat down/frisk," Sergeant Grant kept his assault rifle pointed at the Defendants. After the "pat down" did not detect weapons, Sergeant Hill proceeded towards the opened front side passenger door of Defendant Henry's vehicle and observed ammunition lying in plain view on the floorboard. In response to seeing the ammunition, Sergeant Hill yelled, "ammo!" Officer Brooks then proceeded towards the car's opened door, shined his flashlight into the vehicle and also observed the ammunition while Defendant Henry was standing next to the vehicle's opened door. Thereafter, Officer Brooks asked each Defendant whether he possessed a license to carry a firearm. All three Defendants replied, "no." Convinced that where there is ammunition there is/are firearms, Officer Brooks searched the vehicle's glove compartment box and discovered therein a nine millimeter (9mm) pistol.

After discovering the firearm, Defendants were advised of their rights, placed under arrest and Detective Esprit, an officer who responded to the scene as "back-up" and who was assigned to both the Special Operations Bureau and Forensics, "processed" the vehicle. While "processing" the

vehicle, an automatic three-eighty (380) firearm was discovered under the driver's seat and two (2) thirty-eight caliber (.38) revolvers were discovered in a black compact disk carrier located on the back seat of the vehicle. Defendants were again patted down before being transported to the Richard Callwood Command Station. During a search incident to arrest, Officer Brooks discovered and seized marijuana from Defendant Lima's left front pocket, while Officer Lans, another member of the Special Operations Bureau and also assigned to Forensics, discovered and seized six (6) individually wrapped packages of "Ecstasy" in Defendant Magras' rear pocket.

## II. ANALYSIS

The issues to be resolved by the Court are: (1) whether Officer Brooks and Sergeant Grant lawfully initiated a "traffic stop"; (2) whether Officer Brooks could lawfully order the occupants/Defendants of the stopped vehicle to exit; (3) whether the traffic stop was lawfully converted to a *Terry* stop; (4) whether Officer Brooks articulated facts with reasonable specificity to justify the "pat down" of Defendants; (5) whether observing ammunition in "plain view" on the front passenger floorboard of the vehicle authorized Officer Brooks to search the glove compartment box of Defendant Henry's vehicle; (6) whether the arrest of each Defendant, after officers found a firearm in the vehicle's glove compartment, was lawful; and (7) whether the subsequent search of Defendant Henry's vehicle was lawful.

### A. OFFICER BROOKS AND SERGEANT GRANT LAWFULLY INITIATED A "TRAFFIC STOP."

The Fourth Amendment to the U.S. Constitution is made applicable to the Virgin Islands pursuant to Section 3 of the Revised Organic Act of 1954, as amended. *See* 48 U.S.C.A. § 1561. The Fourth Amendment provides:

> The right of people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized. U.S. CONST. amend IV.

It is well settled that in Fourth Amendment terms, a "traffic stop" entails a seizure of the driver "even though the purpose of the stop is

10

limited and the resulting detention brief." *Brendlin v. California*, 551 U.S. 249, 255, 127 S. Ct. 2400, 2406, 168 L. Ed. 2d 132 (2007) (*citing Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). A vehicle "stop" is thus subject to the constitutional imperative that it not be "unreasonable" under the circumstances. *Id.*

██ Generally, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996). Officer Brooks stopped Defendant Henry for committing two (2) traffic violations done in his presence, i.e., failure to stop at two (2) posted stop signs. Thus, the initial stop of Defendant Henry's vehicle was both constitutional and lawful.

### B. OFFICER BROOKS LAWFULLY ORDERED THE DEFENDANTS AND/OR OCCUPANTS/PASSENGERS OF THE "STOPPED" VEHICLE TO EXIT.

██ In his Motion to Suppress, Defendant Lima contends that Defendant Henry's vehicle was stopped for a traffic violation and thus, there was no reason to order the Defendants/Occupants/Passengers to exit the vehicle. *See Def. Lima's Mot. to Suppress* at p. 5. Before ordering the occupants to exit the vehicle, the officers noted furtive movements taking place inside the vehicle as well as the inordinate amount of time it took the driver to bring the requested documents to the officers. Additionally, the officers detected the nervousness of the driver and the surprising disclosure that he did not know the names of the occupants in the vehicle.

██ The U.S. Supreme Court has repeatedly recognized that "traffic stops" are dangerous encounters wherein police officers can be assaulted or murdered. *United States v. Moorefield*, 111 F.3d 10, 13 (1997). In order to minimize that threat, the Supreme Court has held that once a motor vehicle has been lawfully detained for a traffic violation, a police officer may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331 (1997). Moreover, a police officer making a traffic stop **may also order the passengers to exit** the vehicle pending the completion of the stop. *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S. Ct. 882, 886, 137 L. Ed. 2d 41 (1997).

In the case *sub judice*, because Defendant Henry's vehicle was lawfully detained for two (2) traffic violations, and the officers had reason

to believe that the occupants may be armed and dangerous, Officer Brooks lawfully ordered the other Defendants/Occupants/Passengers to exit the "stopped" vehicle.

### C. The "Traffic Stop" Was Lawfully Converted To A "Terry Stop."

■ In a "traffic-stop" setting, the *Terry* condition of a lawful investigatory stop is met whenever it is lawful for the police to detain an automobile and its occupants pending inquiry into a vehicular violation. *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 784, 172 L. Ed. 2d 694 (2009). Additionally, police need not have cause to believe that any occupant of the vehicle is involved in criminal activity. *Id.* at 784. An officer's inquiries into matters unrelated to the justification for the traffic stop . . . does not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *Id.* at 784.

■ After a justified and lawful traffic stop, an officer who develops a reasonable, articulable suspicion of criminal activity may inquire beyond the reason for the "traffic stop" and may detain the vehicle and its occupants for further investigation. *United States v. Givan*, 320 F.3d 452, 458 (2003). While "reasonable suspicion" must be more than an inchoate "hunch," the Fourth Amendment only requires that the police articulate some minimal objective justification for an investigatory stop. *Id.* In *United States v. Givan, supra*, at p. 459, the court held that after receiving conflicting stories from the driver of, and passengers in, an out-of-state rental car as to their travel plans, the state trooper was justified in further extending the original stop and asking for consent to search the vehicle.

■ Here, Officer Brooks testified that when he initially pulled over Defendant Henry's vehicle for running two (2) stop signs, he did not suspect the occupants to be involved in any type of criminal activity.[1] However, Officer Brooks testified that his suspicion heightened after processing: (1) the inordinate delay in the driver, Defendant Henry,

---

[1] Specifically, Officer Brooks testified that he did not witness Defendant Henry's vehicle involved in any other illegal activity *other than* [emphasis added] its failure to stop at the two (2) posted stop signs. *Suppression Hr'g* at p. 54. Officer Brooks further testified that he did not smell marijuana or any other illegal substance emanating from Defendant Henry's vehicle. *See Suppression Hr'g* at p. 82.

12

retrieving his license, registration and proof of insurance; (2) Defendant Henry's visible nervous demeanor; (3) Defendant Henry's inability to identify his passengers;[2] and (4) the continued and unabated furtive movements taking place by all the Defendants inside the stopped vehicle. Specifically, while communicating with Defendant Henry, Officer Brooks observed that Defendant Magras, the front seat passenger, and Defendant Lima, the rear seat passenger, continued to move around inside the vehicle. Based on twenty-two (22) years of experience in law enforcement, Officer Brooks concluded that the Defendants were attempting to hide or conceal something. Since Officer Brooks was able to articulate an objective reasonable basis for suspecting that Defendants were involved in some type of criminal activity, his decision to extend and/or convert the "traffic stop" to a full *Terry* stop" was justified.

### D. OFFICER BROOKS ARTICULATED FACTS WITH REASONABLE SPECIFICITY JUSTIFYING THE "PAT DOWN" OF DEFENDANTS.

In his Motion to Suppress, Defendant Magras contends that the "pat down" component of the *Terry* stop violated Defendants' Fourth Amendment rights. Specifically, Defendant Magras contends that Officer Brooks failed to provide specific articulable facts justifying the "pat down" of Defendants and therefore requests that his Motion to Suppress be granted. *See Def. Magras' Mot. to Suppress* at p. 3.

The purpose of a *Terry* stop **is not** to discover evidence of a crime, but to allow officers to pursue their investigation without the fear of violence. *People v. Archibald*, 50 V.I. 74, 92 (Super. Ct. V.I.). In determining whether the officer acted reasonably under the circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to specific inferences which he is entitled to draw from the facts in light of his experience. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889 (1968). A court must therefore measure the reasonableness of an officer's suspicion by taking into account the totality of the circumstances. *United States v. Focareta*, 283 Fed. Appx. 78, 83 (3rd Cir. 2008).

---

[2] Specifically, Officer Brooks testified, ". . . that heighten my suspicion a little bit. You know, you give people a ride this hour of the night and you don't know who they are." *See Suppression Hr'g* at p. 15.

During investigative stops, including traffic stops, a police officer may perform a protective "pat down" and/or "frisk" of a defendant's person when he has reason to believe that the person with whom he is dealing is armed and/or dangerous. *United States v. Moorefield*, 111 F.3d 10, 14 (3rd Cir. 1997). The protective search of a defendant's person can be conducted notwithstanding the absence of probable cause to arrest the defendant for a crime. *Id.* The officer need not be absolutely certain that the individual is armed. *Id.* Rather, the issue is whether a reasonably prudent man under the same circumstances would believe that his safety or that of others was in danger. *Id.* In applying this standard, courts generally require proof that the suspect engaged in specific, suspicious conduct during the stop, such as failing to promptly obey the officer's orders, or making furtive movements and gestures. *United States v. Atkins*, 2000 U.S. Dist. LEXIS 8390, *6 (E.D. Pa. 2000).

In *State v. Brown*, 160 N.J. Super. 227, 389 A.2d 507 (Super. Ct. N.J. 1978), a police officer observed an automobile, containing several individuals, swerving between marked lanes of a highway and tailgating another vehicle. When the officer turned on his overhead lights to pull the vehicle over to the side of the road, he noticed the rear passenger lean forward as though he were attempting to conceal something beneath the rear seat. *Id.* Based on those observations, the court found that the officer was justified in stopping the vehicle and ordering the defendants to step out of the vehicle so that they could be frisked for weapons in the interest of officer safety. *Id.*

Objectively assessing the totality of the circumstances in the case *sub judice*, at the time the Defendants were "patted down/frisked," Officer Brooks articulated a specific and objective reasonable basis for believing that the Defendants may be armed and dangerous. Significantly, the officers' interactions with the Defendants occurred at night. Although Defendant Henry was ordered to pull over his vehicle for having committed two (2) traffic infractions, he chose to drive approximately one hundred (100) feet into a darkened road. Defendant Henry continued driving notwithstanding the fact that the officers turned on their patrol unit's strobe lights, siren and high beams.

Defendant Henry's failure to stop immediately not only heightened the suspicion of Officer Brooks and Sergeant Grant but also increased the chances of danger to both officers since the dark area could have obscured the officers' line of vision sufficient enough to prevent

14

them from observing the Defendants reaching for and/or concealing weapon(s). The officers reacted to their sense of danger by calling for immediate "back up." Despite being hampered, the officers nonetheless observed furtive movements by Defendant Henry, Magras and Lima while they (Defendants) were inside the "stopped" vehicle. Additionally, Defendant Henry gave the officers more cause for pause when he took approximately five (5) minutes to emerge from the vehicle with the requested documents,[3] appeared nervous and denied knowing the identity of his passengers.[4] These events, when taken together, were sufficient to create articulable suspicion that criminal activity may be "afoot" and/or to reasonably believe that the Defendants may be dangerous and armed. *Ergo*, the officers were authorized under *Terry* to remove the Defendants/passengers from the stopped vehicle and conduct a protective search of their persons for weapons in the interest of officer safety.

### E. OBSERVING AMMUNITION IN PLAIN VIEW AUTHORIZED OFFICER BROOKS TO SEARCH THE GLOVE COMPARTMENT BOX OF DEFENDANT HENRY'S VEHICLE.

 Having ruled that the "stop" and "pat down" of Defendants were justified, albeit yielding no weapons, the Court must next determine whether the subsequent search of Defendant Henry's glove compartment for weapons was lawful. The search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if, based on specific and articulable facts, which, taken together with the rational inferences from those facts, reasonably lead the officer to believing that [a] suspect(s) is/are dangerous and may gain immediate control of weapons. *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 3481, 77 L. Ed. 2d 1201 (1983). While possession of ammunition or a licensed firearm, without more, may be legal in the

---

[3] *See Suppression Hr'g*. at p. 15.

[4] The Court notes that it is not unconstitutional or improper for a police officer to ask the name of a passenger in a car. In the ordinary course of his duties, a police officer is free to ask a person for identification without implicating the Fourth Amendment. *United States v. Warren*, 2008 U.S. Dist. LEXIS 21386, *4 citing *Hibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004); *see also United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well.).

Virgin Islands, innocent conduct may nonetheless create reasonable suspicion that criminal activity is afoot. *United States v. Lewis*, 50 V.I. 366, 374.

In *re O.J.*, 958 A.2d 561, 566 (Pa. Super. Ct. 2008), the court held that a police officer's protective search of a vehicle's console compartment for weapons was justified after a lawful traffic stop. Although the juvenile in that case was secured in a patrol car at the time the officer conducted the protective search, prior to being "stopped" the juvenile's conduct was quite "suspect." Specifically, the juvenile was observed speeding, he failed to stop at a traffic light and did not heed police attempts to initially stop his car. *Id.* Additionally, the event occurred at night, the officer noticed the juvenile engaging in excessive movement of his arms where the car's console compartment was located and the console had been left partially open. *Id.* The court therefore reasoned that due to the nature of the traffic stop and the fact that the juvenile would not have been placed under arrest for traffic code violations, but would have been permitted to return to his car, the protective search of the vehicle was lawful because it was limited to the car's passenger compartments, to wit: the console compartment. *Id.*

In the case *sub judice*, when the protective searches of the Defendants' persons did not detect weapons, the Defendants, in all likelihood, would have been permitted to re-enter the vehicle. Before the Defendants re-entered the vehicle however, Sergeant Hill and Officer Brooks observed, through the vehicle's open passenger door, ammunition in "plain view" on the car's front passenger floorboard. This observation resurrected the officers' prior articulable suspicions that the Defendants were dangerous. Given the ammunition in plain view, the officers were led to believe, that if the Defendants were allowed to re-enter the vehicle without a limited protective search of the vehicle, they could gain immediate control of a weapon(s) since oftentimes where there is ammunition there are firearms. Hence, the officers were authorized under *Long* to conduct a limited protective search of the passenger compartments) of Defendant Henry's vehicle because the compartments are areas where a weapon may be placed or hidden.

 The constitutional safeguards for the accused do not require an officer to gamble with his life. *Pennsylvania v. Morris*, 537 Pa. 417, 422, 644 A.2d 721, 724 (Pa. 2004). Here, Officer Brooks was not required to take any unwarranted risk(s) with his life and/or the lives of his

16

colleagues. After observing bullets on the floorboard in "plain view," the officers were justified in conducting a limited protective search because Defendants could have removed the firearm from the car's glove compartment and used the weapon against Officer Brooks, Sergeant Grant or any of the additional officers that responded to the scene. Accordingly, the limited protective search of the vehicle's glove compartment was reasonable and did not violate the Defendants' Fourth Amendment rights.

## F. THE ARREST OF THE DEFENDANTS, AFTER OFFICERS FOUND A FIREARM IN THE VEHICLE'S GLOVE COMPARTMENT, WAS LAWFUL.

Pursuant to V.I. CODE ANN. tit. 14 § 2253(a), it is unlawful for an individual to possess an unlicensed firearm. The statute states in pertinent part:

> Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either openly or concealed on or about his person, **or under his control in any vehicle** of any description any firearm, as defined in Title 23, section 451(d) of this code, loaded or unloaded, **may be arrested without a warrant.** . . (V.I. CODE ANN. tit. 14 § 2253(a)).

V.I. CODE ANN. tit. 14 § 2253(d)(4) defines "possession" as both *actual* and *constructive* possession. To prove constructive as opposed to *actual* possession of a firearm, it must be established that an individual had the "power and intention at any given time to exercise dominion or actual control over the firearm either directly or through another person." V.I. CODE ANN. tit. 14 § 2253(d)(5). (*See also Government of the Virgin Islands v. Isaac*, 45 V.I. 334, 342 (Terr. V.I.); *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir.1992) (quoting *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991); *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996) (*quoting United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993); *U.S. v. Basley*, 357 Fed. Appx. 455 (C.A.3 (Pa.)). In addition to having dominion and control over the firearm, a defendant must also have knowledge of the gun's existence to establish constructive possession. *Basley*, 357 Fed. Appx. at 460.

In our case under consideration, after observing bullets in plain view on the front passenger floorboard of Defendant Henry's vehicle, Officer Brooks asked each Defendant whether he possessed a license to carry a firearm. All three Defendants replied, "no." However, an immediate

search of the vehicle's glove compartment box disclosed a nine millimeter (9mm) pistol hidden and/or concealed therein. Thereafter, each Defendant was advised of his rights and placed under arrest for "constructive" possession of an unlicensed firearm.

 Probable cause for Defendant Henry's arrest was apparent because he drove and owned the vehicle and therefore "transported" the weapon pursuant to V.I. CODE ANN. tit. 14 § 2253(a). Probable cause was equally apparent for Defendant Magras, who was seated directly in front the glove compartment where the firearm was found. Although Defendant Lima was originally seated in the rear of the vehicle, probable cause existed for his arrest as well because he had "the power and intention at any given time to exercise dominion and actual control over the firearm," that was found at the time of the arrest, through either Defendant Henry or Defendant Magras, in violation of V.I. CODE ANN. tit. 14 § 2253. Clearly, it can be inferred from the furtive movements while seated inside the vehicle that the Defendants were attempting to hide and/or conceal the firearm, which could have been passed from Defendant Lima to Defendant Magras, the front passenger, and placed in the glove compartment. Thus, the requisite mental intent to unlawfully possess the firearm(s) was substantiated. Moreover, it can be further inferred that each Defendant had knowledge of the gun's existence. Accordingly, when the firearm was discovered in the glove compartment of Defendant Henry's vehicle, the officers were authorized to arrest all three (3) Defendants for "constructive" possession of an unlicensed firearm under V.I. CODE ANN. tit. 14 § 2253(a).

### G. THE SUBSEQUENT SEARCH OF DEFENDANT HENRY'S VEHICLE WAS LAWFUL.

The Defendants contend that the items recovered during the subsequent search of Defendant Henry's vehicle after their arrests, must be suppressed in order to preserve certain constitutional guarantees. Specifically, in their Motions to Suppress, Defendants contend that Defendant Henry was stopped for a "traffic" violation and thus, any subsequent search of his vehicle violated their Fourth Amendment rights. In support of their contentions, Defendants rely on *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009). However, Defendants' reliance on *Arizona v. Gant* is misplaced.

In *Gant*, the U.S. Supreme Court held that "the search incident to arrest" exception to the warrant requirement **did not** apply to the search

of defendant's vehicle following his arrest for **driving with a suspended license because the defendant and two other suspects were handcuffed and secured in separate patrol cars** before the search and could not reasonably access the vehicle. *Id.* Additionally, the court reasoned that it was not reasonable for the police to believe that evidence of the offense for which the defendant was arrested, to wit: driving without a license, could have been found inside the vehicle. *Id. Ergo,* the court found the search unreasonable. Unlike the defendant in *Gant,* the Defendants in this matter were not arrested for a traffic violation. Rather, they were arrested for "constructive possession of an unlicensed firearm," thereby making it reasonable for the officers to believe that evidence of the offense could be found inside the vehicle. More importantly, the firearm was recovered pursuant to *Long* and in furtherance of a limited protective search after articulable suspicion was established that the Defendants/Occupants/Passengers could be "armed" and "dangerous." Thus, the issue of suppression cannot be analyzed under *Gant.*

In *New York v. Belton,* 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), the Supreme Court held that when a policeman has made a *lawful custodial arrest* of the occupants of an automobile, he may, as a contemporaneous incident of that arrest, *search the passenger compartments) of the vehicle and may also examine the contents of any container found within the passenger compartment.*[5] The Supreme Court solidified the authority of an officer to search the passenger compartments of a vehicle incident to a lawful arrest in *Thornton v. United States,* 541 U.S. 615, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004) (holding "the Fourth Amendment allows an officer to search a vehicle's passenger compartment as a contemporaneous incident of arrest, even when the officer does not make contact until the person has already left the vehicle.").

The officers herein searched the vehicle's other passenger compartments *after* the Defendants were arrested. During the search, the officers uncovered an automatic three-eighty (380) firearm under the driver's seat of the vehicle as well as two (2) thirty-eight caliber (.38) revolvers in a black compact disk carrier located on the rear seat of the

---

[5] The Supreme Court found that a "container" constituted "an object capable of holding another object." *New York v. Belton,* 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768. The Court therefore held that a container may be searched whether it is open or closed. *Id.*

car. Since the officers were authorized to: (1) conduct a protective search of the car's passenger compartments pursuant to *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); (2) impound Defendant Henry's vehicle and conduct an inventory search of its contents pursuant to *Cooper v. California*, 386 U.S. 58, 87 S. Ct. 788, 17 L. Ed. 2d 730 (1967); and (3) search the passenger compartments of the vehicle and the contents found within the passenger compartments incident to a lawful arrest pursuant to *Thornton v. United States*, 541 U.S. 615, 124 S. Ct. 2127, 158 L. Ed. 2d 905 (2004), the recovery of the weapons found during the subsequent search after the Defendants' arrests were "inevitable" and therefore not suppressible.

## III. CONCLUSION

The officers' decision to stop Defendant Henry's automobile was reasonable because they personally observed Defendant Henry commit two (2) traffic violations. Thus, the initial "traffic stop" of the vehicle was constitutional and lawful. Because Officer Brooks observed the furtive movement within the vehicle, the inordinate delay in the driver presenting his documents and the driver's nervousness and unfamiliarity with his passengers, the officers had reasonable suspicion that the Defendants were "armed" and "dangerous." Consequently, Defendants were lawfully ordered to exit the stopped vehicle.

Given the totality of the circumstances, Officer Brooks had reasonable suspicion to believe that all the Defendants were involved in some type of criminal activity so the "traffic stop" was extended and converted to an investigatory "*Terry* stop." Although a "pat down" was conducted of all three Defendants, it yielded no weapons on their persons. Before the Defendants re-entered the vehicle, officers observed bullets in plain view on the front passenger floorboard of Defendant Henry's vehicle. Having observed the bullets, the officers were authorized to conduct a "limited protective search" of the passenger compartments of the car. Specifically, officers were authorized to search Defendant Henry's glove box as well as other areas within the vehicle where a weapon may be placed or hidden.

Upon locating a firearm in the vehicle's glove compartment, the officers had probable cause to arrest the Defendants for "constructive" possession of the firearm because it could be reasonably inferred that each Defendant, while seated inside the vehicle, had the requisite power and intention at any given time to exercise dominion or actual control over the

20

weapon either directly or indirectly. More importantly, none of the Defendants possessed a firearm license as required under Virgin Islands law. Following the arrests of the Defendants, the officers were authorized to further search the passenger compartments of Defendant Henry's vehicle wherever a firearm could be hidden or concealed. Additionally, the officers were authorized to search the vehicle incident to the lawful arrests of the occupants and/or pursuant to an inventory of the vehicle and seize the illegal items and/or contraband found therein.

Accordingly, Defendants' motions for suppression shall be **DENIED**.